Mrs. Evelyn H. DOMANGUE, Etc.

v.

EASTERN AIR LINES, INC., et al.

Civ. A. No. 75–3006.

United States District Court,
E. D. Louisiana.

Nov. 24, 1981.

Michael X. St. Martin, St. Martin & St. Martin, Houma, La., Tony B. Jobe, New Orleans, La., for plaintiff.

Francis G. Weller, Marc J. Yellin, Deutsch, Kerrigan & Stiles, New Orleans, La., for Eastern Airlines, Inc.

John P. Volz, U.S. Atty., Roy Blondeau, Asst. U.S. Atty., New Orleans, La., H. Richmond Fisher, Atty., U.S. Dept. of Justice, Washington, D.C., for United States of America.

## MEMORANDUM OPINION AND ORDER

EDWARD J. BOYLE, Sr., District Judge:

The instant suit arises out of the June 24, 1975 crash of Eastern Airlines' Flight No. 66 as it approached Kennedy International Airport in route from New Orleans, Louisiana. Mrs. Evelyn H. Domangue, the widow of Barry Joseph Domangue, who was killed in the crash, filed an action individually and on behalf of her minor children in the Eastern District of Louisiana on September 25, 1975.[1] By decision of the Multidistrict Litigation Panel on February 4, 1976, Mrs. Domangue's suit, together with all other actions arising from the crash, was transferred to the Eastern District of New York for handling of all pre-trial procedures.[2] Judge Bramwell of that Court then ordered the actions transferred to the Eastern District of New York pursuant to 28 U.S.C. § 1404(a) and consolidated for purposes of trial on the issue of liability.[3] Following rendition of a final judgment on liability, the parties would be allowed to move for an order returning the action to the originating district court for trial on the quantum issues.

On the date trial of the matter commenced,[4] September 18, 1978, plaintiffs in

1. Suit initially was filed against Eastern Airlines, Inc. and the Boeing Co. Once the action was transferred to New York, the Boeing Co. was dismissed from the suit by stipulation of the parties and several other defendants, including the United States of America, were added by way of amended complaints. Record, Docs. 30, 52, 7, 15 (E.D.N.Y.). Note: Doc. # 7 is not in the E.D.N.Y. record. *See* Doc. A. Thereafter, by stipulation, the parties agreed to dismiss all the remaining defendants except the U.S.A. and Eastern Airlines. Record, Doc. 53 (EDNY) [hereinafter, Record from Eastern District of New York denoted by (EDNY) appearing after cite and Record from Eastern District of Louisiana by (EDLA) appearing after the cite.]

2. *In re Aircrash Disaster at John F. Kennedy International Airport on June 24, 1975*, 407 F.Supp. 244, 247 (Jud.Pan.Mult.Lit.1975); Record, Doc. 11 (EDLA).

3. *See In re Air Disaster at John F. Kennedy Intern. Airport*, 479 F.Supp. 1118, 1121–1123 (E.D.N.Y.1978) for a discussion by Judge Bram-

well of this order. The order itself is missing from the record.

4. Trial was originally set for September 11, 1978. The morning of the trial, the United States, although not admitting any negligence, consented to entry of liability judgments against it in all passenger cases. The plaintiffs' cases against the United States were severed and trial on the issue of Eastern's liability was reset for September 15, 1978. Thereafter, on the day of trial, eleven plaintiffs, not including Mrs. Domangue, moved for summary judgment and/or judgment on the pleadings based on the contention that their cases were governed by the Warsaw Convention and Montreal Agreement. The court, without affording Eastern an opportunity to submit written oppositions, granted the motions of four plaintiffs and denied the motions of the remaining seven plaintiffs for the reason that in the latter cases disputes remained as to the proper parties to prosecute the actions.

Trial was again reset for September 18, 1978, on which date the trial actually proceeded after

five of the actions, one of which was Mrs. Domangue, moved orally to sever their claims from the impending liability trial and for entry of judgments of liability against Eastern on the basis of the Warsaw Convention[5] and Montreal Agreement.[6] Eastern opposed the motions claiming several of its affirmative defenses raised issues of fact and requested the court allow it the time provided in the Federal Rules of Civil Procedure to submit memoranda in opposition. Judge Bramwell granted the motions from the bench over Eastern's objections.[7] Final judgments were entered in favor of Mrs. Domangue and the plaintiffs in the other four actions on September 28, 1978, from which Eastern appealed.[8]

While the appeal was pending in the Second Circuit, the district court ordered the judgments be amended to delete the Rule 54(b) language and ordered the transfer of this case and four others back to the Eastern District of Louisiana.[9] On January 16, 1979, the Second Circuit granted a stay of these transferals, but, determining it was without jurisdiction to review the disputed judgments, remanded the case suggesting Judge Bramwell consider certification pursuant to 28 U.S.C. § 1292(b).[10] Thereafter, the district court granted Eastern's motion to certify the Warsaw/Montreal judgments and, at the same time, granted the motions of Mrs. Domangue and the plaintiffs in the other four cases to reaffirm the earlier judgments and to amend them to allow Eastern to interpose its affirmative defenses at the damage trials.[11] On Appeal, the Second Circuit reversed the judgments of liability based on Warsaw/Montreal entered by the district court, thereby returning Mrs. Domangue's and the other four plaintiffs' cases to their pre-trial posture "where all issues . . . liability as well as damages, have yet to be resolved."[12]

The Second Circuit suggested the plaintiffs reurge their original motions for a finding of liability on the part of Eastern.[13] Instead, Mrs. Domangue, misconceiving the Second Circuit decision as favorable to her, moved to transfer the case back to Louisi-

---

Judge Bramwell disposed of the plaintiffs' motions referred to in the text. The jury rendered a verdict in favor of plaintiffs finding Eastern was negligent. Judgment on the October 25th verdict was entered on October 30, 1978, which judgment was affirmed by the Second Circuit. *In re Aircrash Disaster at John F. Kennedy International Airport on June 24th, 1975*, 635 F.2d 67 (2nd Cir. 1980).

5. The Warsaw Convention is officially denominated "Convention for the Unification of Certain Rules Relating to International Transportation by Air." 49 Stat. 3000 (1934) (reprinted in English in 49 U.S.C.A. § 1502 at pp. 430 *et seq.*) (hereinafter cited as Convention).

6. The Montreal Agreement is officially denominated "Agreement Relating to Liability Limitation of the Warsaw Convention and the Hague Protocol." CAB 18,900; *see* L. Kreindler, Aviation Accident Law § 12A.03 at 12A–4 (1980) for a copy of this agreement. The agreement was then approved by the Civil Aeronautics Board. Order No. E–23680, Vol. 31, No. 97, Fed.Reg. 7302 (May 19, 1966); *see* 49 U.S.C.A. § 1502 at pp. 437–438 for a full reprint of the CAB order.

7. The basis for Judge Bramwell's ruling, although not appearing in the orders themselves, is suggested by his December 1, 1978 opinion, wherein he stated:

"After due consideration, said motion [seeking entry of judgment against Eastern Airlines on the basis of the provisions of the Warsaw Convention/Montreal Agreement] was subsequently granted, *cf. Day v. Trans World Airlines, Inc.*, 393 F.Supp. 217 (S.D.N.Y.), *aff'd*, 528 F.2d 31 (2d Cir. 1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976). . . ." 479 F.Supp. at 1121.

8. Record, Docs. 21, 22, 23 (EDNY)—*see* Record Doc. A.

9. Record, Doc. 28 (EDNY); *see* Note 3, supra. A sixth case was remanded to the Middle District of Louisiana.

10. *See Winbourne v. Eastern Airlines, Inc.*, et al., 479 F.Supp. 1130, 1136, n.1.

11. Record, Docs. 36, 37, 39 (EDNY). On May 11, 1979, Judge Bramwell issued a Memorandum Opinion and Order setting forth written reasons for his March 23, 1979, rulings as well as disposing of several other motions before the court in the case. *Winbourne v. Eastern Airlines, Inc.*, supra, n.7.

12. *Winbourne v. Eastern Airlines, Inc.*, 632 F.2d 219, 227 (2d Cir. 1980).

13. *Id.* at 224–225.

ana for a damage trial.[14] Eastern opposed the transfer and moved to dismiss the action on grounds of lack of capacity to sue.[15] Eastern argued correctly the Second Circuit decision reversed the earlier determinations of liability, leaving the issue undecided. Prior to ruling on the motions of Mrs. Domangue and Eastern, Judge Bramwell granted the motions of plaintiffs in six other cases [16] to transfer their suits back to the forums where originally commenced. In an unpublished opinion, supporting that ruling, Judge Bramwell stated that entry of a judgment of liability on the part of Eastern would be but a "mere formality," as "Eastern's liability ... now has been established under Warsaw/Montreal, see 479 F.Supp. at 1141, and by virtue of the doctrine of collateral estoppel since in the non-Warsaw/Montreal cases, Eastern has been found liable for the June 24, 1975 air crash after a trial by jury." [17] He did not enter such judgments, however, as the district courts in Louisiana had to determine the merit of Eastern's affirmative defenses, such as lack of capacity to sue, before liability judgments could be rendered.[18] Following this ruling by Judge Bramwell, Mrs. Domangue and Eastern entered into a stipulation whereby the case was transferred back to the Eastern District of Louisiana and Mrs. Domangue's capacity to sue was accepted.[19] Thus the issue of liability on the part of Eastern under Warsaw/Montreal was not decided by either the district court in the Eastern District of New York or the Second Circuit and remained for the originating courts to determine.

Once back in the Eastern District of Louisiana, Eastern moved for partial summary judgment on the ground there was no genuine issue of material fact concerning the applicability of the Warsaw Convention and the Montreal Agreement to the liability of Eastern to plaintiff.[20] Plaintiff, contrary to the position she had asserted since the commencement of the case, opposed the motion arguing Warsaw/Montreal did not apply or, at the least, its application was an issue to be resolved by the jury.[21] Eastern's motion was taken under submission following oral argument. We grant the motion.

## I.

In 1934, the United States agreed to adhere to the Warsaw Convention, which treaty was confected to protect the then infant aviation industry and to establish uniformity in the laws of the several nations affecting international aviation. The treaty, according to Article 1, was· to govern the rights and responsibilities of carriers with respect to the international transportation, for hire or gratis, of persons, baggage or goods. In the event of death or bodily injury to a passenger, the carrier would be presumed liable "if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." [22] A carrier's liability, however, would be limited to a maximum damage recovery of 125,000 Poincare francs,[23] unless the passenger could prove willful misconduct, in which case liability would be unlimited.[24] Liability would not lie if the carrier could show it had "taken all necessary

---

14. Record, Doc. 42 (EDNY).

15. Record, Docs. 43, 44, 49, 50 (EDNY).

16. Three of the six plaintiffs were the same parties whose cases had been remanded to Louisiana district courts in December, 1978, which transfers were stayed by the Second Circuit in January, 1979. See, supra, notes 8 and 9 and accompanying text.

17. Record, Doc. 19, Exhibit 3 at p. 11 (EDLA).

18. Id. at pp. 11–12.

19. Record, Doc. 53 (EDNY).

20. Record, Doc. 19 (EDLA).

21. Record, Doc. 28 (EDLA).

22. Convention, Article 17; see Benjamins v. British European Airways, 572 F.2d 913, 917 (2d Cir. 1978), cert. denied, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1979); Williams v. Fidelity & Casualty Co. of N.Y., 442 F.Supp. 455, 456 (E.D.La.1977).

23. Convention, Article 22(1), (4).

24. Convention, Article 25.

measures to avoid the damage or . . . it was impossible . . . to take such measures"[25] or show "the damage was caused by or contributed to by the negligence of the injured person."[26]

The Warsaw Convention was modified in 1966 for flights involving a location in the United States by agreement between "the principal international air carriers,"[27] including Eastern Airlines, Inc.[28] Confronted with the United States' formal denunciation of the Convention because of its low damage recovery limitation, the signatory carriers agreed to waive the defenses available to them under Article 20(1) and by special contract to increase the maximum recoverable damage award. Thus, under the 1966 Montreal Agreement, "liability for injuries described by Article 17 of the Warsaw Convention became absolute and the maximum damages were increased to $75,000."[29]

The Warsaw/Montreal system of absolute liability for the carrier up to $75,000 per passenger regardless of any fault or negligence, will apply in a given case if: (1) the passenger's travel is "international transportation" within the meaning of Article 1(1), (2); (2) the passenger ticket, containing "a statement that the transportation is subject to the rules relating to liability established by [the] Convention" and Montreal Agreement in 10 point type, is delivered within the meaning of Article 3(1), (2); (3) the accident which is said to have caused the damage took place on board the aircraft or in the course of any of the operations of embarking or disembarking;[30] (4) the passenger did not contribute to the accident;[31]

and (5) the damage was not caused by the willful misconduct of the carrier.[32] The parties do not dispute that the deceased, an Eastern Flight 66 passenger whose final destination was Aberdeen, Scotland, was in "international transportation," that the accident occurred aboard the aircraft and that the deceased in no way contributed to the accident. At issue is whether Mr. Domangue, the deceased, was delivered a ticket with the requisite notice and whether Eastern is culpable of willful misconduct.

Frequently, resolution of the question of delivery of a proper passenger ticket poses issues of considerable complexity. Here, however, resolution of the issue is much simpler. The evidence is uncontroverted that the deceased physically received his pre-paid ticket from the Eastern Airlines ticket counter in the New Orleans Airport on June 24, 1975, the day of the flight, prior to his proceeding to Eastern's flight check-in counter and boarding the plane.[33] The instant case is, therefore, distinguishable from the cases cited to the court by plaintiff wherein "delivery" within the meaning of Article 2 was held not to have been perfected when the passenger was handed a ticket as he was mounting the stairs to board the aircraft, in one case,[34] and already seated on the airplane, in the second.[35] Neither passenger had the opportunity to purchase additional flight insurance prior to boarding the airplane, which opportunity to take steps to protect against the Convention's limits is the purpose behind the delivery requirement.[36] According to the Ninth Circuit in *Warren v. Flying*

---

25. Convention, Article 20.

26. Convention, Article 21.

27. Montreal Agreement, supra, note 6.

28. S. Speiser and C. Krause, Aviation Tort Law § 11:19, note 27 (1978).

29. *Day v. Trans World Airlines*, 528 F.2d 31, 33 (2d Cir. 1975), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

30. Convention, Article 17.

31. Convention, Article 21.

32. Convention, Article 25.

33. Affidavit of Mrs. Evelyn H. Domangue, Record, Doc. 48 (EDLA); Affidavit of William S. Johnson, Record, Doc. 43, Exhibit 1 (EDLA); Affidavit of Eugene C. Kurtz, Record, Doc. 43, Exhibit 2 (EDLA).

34. *Warren v. Flying Tiger Line, Inc.*, 352 F.2d 494 (9th Cir. 1965).

35. *Mertens v. Flying Tiger Line, Inc.*, 341 F.2d 851 (2d Cir. 1965).

36. *Warren*, supra, at 497.

*Tiger Line, Inc.*, supra, "[h]ad they been issued passenger tickets in the terminal, carrying notice of the Warsaw Convention limitation of liability, they would have had ample time to obtain additional insurance." [37]

The evidence in this case shows that Mr. Domangue received his ticket at the Eastern Airlines ticket counter at the airport in New Orleans.[38] Mr. Domangue then had to proceed to the check-in counter at the boarding gate before he could board the aircraft. During that interim, Mr. Domangue had a reasonable opportunity to take measures to protect himself against the limitation of liability provision contained in his ticket.

However, plaintiff argues, analogously to *Lisi v. Alitalia-Linee Aeree Italiane, S. p. A.* [39] that an issue of fact to be tried to the jury remains as to whether the physical delivery of the ticket was inadequate for the reason that the ticket did not contain the requisite limitation of liability notice. Counsel for plaintiff argues that those pages containing the Warsaw limitation language may have been pulled inadvertently from the decedent's ticket during one of the check-in procedures thus rendering the ticket defective for want of the proper notice. The affidavit of Elizabeth Allen McGann, an airline industry employee, but never an employee of Eastern, was submitted to substantiate this possibility.[40] Ms. McGann's affidavit, however, in addition to being irrelevant as not addressing the procedures used by Eastern Airlines, specifically fails to contravene the evidence

offered by Eastern establishing that Mr. Domangue received a ticket with the required Warsaw/Montreal notice.

The unavailability of the actual passenger ticket issued to Mr. Domangue, which ticket was probably lost in the crash, will not prevent application of the Warsaw Convention and Montreal Agreement.[41] Article 3(2) of the Convention provides "the absence, irregularity or loss of the passenger ticket shall not affect the existence or the validity of the contract of transportation. . . ." Article 3(2) has been read to require that the ticket be delivered to the passenger in such a manner as to afford him a reasonable opportunity to take measures to protect himself against the limitation of liability.

Mr. Johnson, Eastern's manager for the city ticket office in New Orleans since June, 1975, and Mr. Kurtz, the supervisor of ticketing forms and special investigations since January, 1968, both testified the ticket issued to Mr. Domangue, as evidenced by Flight Coupon No. 1 from Ticket No. 0072411470124, which was removed from Mr. Domangue's ticket on June 24, 1975, during standard boarding procedures, was a standardized, computerized ticket of the type issued at the field ticket office at that time.[42] A ticket from the same print run as Mr. Domangue's was submitted by Eastern in conjunction with the above mentioned affidavits, which ticket contained the limitation of liability language required by the Warsaw Convention and Montreal Agreement and mandated by the Air Traffic Conference of America. Mr. Kurtz testified

---

**37.** *Id.* at 498.

**38.** Affidavit of Mrs. Evelyn H. Domangue, Record, Doc. 48 (EDLA).

**39.** 370 F.2d 508 (2d Cir.), *aff'd*, 390 U.S. 455, 88 S.Ct. 1193, 20 L.Ed.2d 27 *rehearing denied*, 391 U.S. 929, 88 S.Ct. 1801, 20 L.Ed.2d 671 (1967).

**40.** Record, Doc. 48, Affidavit of Elizabeth Allen McGann (EDLA).

**41.** In two other cases in this district, summary judgments affirming the applicability of Warsaw/Montreal were granted on the basis of

affidavits and evidence similar to that presented in this case. *See Dispenza v. Eastern Airlines, Inc.*, Civil Action No. 75–2411E, E.D.La.; and *Hickey v. Eastern Airlines, Inc.*, Civil Action No. 76–237F, E.D.La.

**42.** Record, Doc. 19, Exhibit 1 and Doc. 43, Exhibit 1 (EDLA); Record, Doc. 19, Exhibit 2 and Doc. 43, Exhibit 2 (EDLA); Deposition of Eugene C. Kurtz, Record, Doc. 41, pp. 11–12 (EDLA).

the ticket would have had to include the pages containing the Warsaw notice at the time of issuance as the printer used at the field office would have voided a ticket from which some pages had been removed.[43] Thus, Mr. Domangue's ticket had to have contained the required language unless the relevant pages were removed during the later handling of the ticket.

Each flight coupon in the ticket, including Flight Coupon No. 1, refers the passenger to page ten of the booklet. Page ten contains a notice in clear, ten point type [44] referring the passenger to "notice headed 'Advice to International Passengers on Limitation of Liability' ... Page 11 of this ticket." At page eleven, the ticket contains language in equally large type notifying the passenger that "the Warsaw Convention may be applicable" and that "the liability of certain carrier parties ... for death of or personal injury to passengers is limited in most cases to proven damages not to exceed U.S. $75,000 per passenger, and that liability up to such limit shall not depend on negligence on the part of the carrier." The ticket further reads "Additional protection can usually be obtained by purchasing insurance from a private company."

■ These last two pages, pages ten and eleven, are not perforated for easy removal [45] as are the first nine pages of the ticket. In conformity with standard Eastern proce-dures, the representative would not separate these pages from the rest of the ticket. Upon issuance of the ticket, the Eastern agent removes the Universal Credit Card Charge Form, any void coupons and the Auditor's Coupon, discarding all but the latter if, as in the case before us, the ticket is prepaid. Thereafter, upon checking in for the first leg of the flight, the passenger is given a boarding pass in return for Flight Coupon No. 1 which coupon is pulled, stapled to the boarding pass and then retained by Eastern as the passenger enters the jetway to board the plane.[46]

These are the same procedures which were followed by Eastern with respect to Mr. Domangue's ticket. According to Mr. Kurtz, a specific effort would have had to be made by an Eastern representative to remove the last two pages from the ticket. No evidence has been introduced to suggest such an event occurred. Instead, all the evidence and reasonable inferences drawn therefrom establish that Mr. Domangue was delivered a ticket containing the required limitation of liability notice at the ticket counter, which ticket was returned to him after checking in for the flight.

We also note Mr. Domangue likely was aware of the terms and conditions applicable to his international flight. The evidence reveals he had actually used international air transportation in the past.[47]

**43.** Deposition of Eugene C. Kurtz, Record, Doc. 41, pp. 20–21 (EDLA).

**44.** There is no evidence in the record that the type size used in the Notice at page ten of the ticket and the Advice at page eleven is ten point type as required by the Montreal Agreement. And there is no evidence or contention it is not the required type. Moreover, on comparison with the example of ten point type found in the 1980 Collier's Encyclopedia, Volume 19, at page 381 (Appendix A), we conclude that the caption and text of the notice on page ten, as well as the captions to and the texts of the "ADVICE TO INTERNATIONAL PASSENGERS ON LIMITATION OF LIABILITY" and "NOTICE OF BAGGAGE LIABILITY LIMITATIONS," appearing on page 11 are in ten point type. See Exhibit Kurtz No. 1, pp. 10–11, to Deposition of Eugene C. Kurtz, Record, Doc. No. 41 (EDLA).

**45.** Record, Doc. 41, see attached ticket (EDLA); see also Record, Doc. 43, Exhibit 2 (EDLA). An examination of the ticket attached to Mr. Kurtz's deposition shows Mr. Kurtz is correct that there are no perforations in pages ten and eleven like those found on the other coupon pages. The perforations in these pages are located approximately one-half inch from the left edge of the ticket. These perforations are also found on all the pages and are for removing the ticket from the printer. The second line of perforations, which perforations are for easy removal and are not found on pages ten and eleven, are one inch from the left edge of the ticket. See Record, Doc. 41, pp. 15, 22 (EDLA).

**46.** Affidavits, supra, note 42.

**47.** Deposition of Evelyn H. Domangue, April 2, 1981, Record Doc. 58, pp. 10–16 (EDLA).

From July of 1973 until his death in 1975, Mr. Domangue held several jobs overseas with Brown and Root Foreign Subsidiaries[48] and on the day of the accident he was returning to his job in the North Sea.[49] However, it is not necessary that Eastern show Mr. Domangue knew of the contract provisions. Under the Warsaw Convention and Montreal Agreement, Eastern need only show that Mr. Domangue was delivered a ticket of such tenor and in such a manner as to afford him a reasonable opportunity to become aware of the limitation of liability provision and to take measures to protect himself against its effects. *Warren v. Flying Tiger Line, Inc.*, supra, at p. 497; *Mertens v. Flying Tiger Line, Inc.*, supra, at pp. 856–857. Eastern has satisfied that burden.

In the alternative, plaintiff argues decedent's death was caused by the willful misconduct of Eastern, thereby precluding the carrier from limiting its liability to the amount set forth in the Montreal Agreement.[50] However, plaintiff's argument is only that and is unsupported by any evidence.[51] Thus, the Warsaw Convention as supplemented by the Montreal Agreement will apply to the instant case unless Eastern has waived its beneficial provisions.

In early 1978, Eastern Airlines, Inc. and the United States of America entered into an agreement whereby Eastern agreed to contribute sixty percent toward the settlement or payment of damage awards of the passenger claims not yet settled. No reference was made to the Warsaw Convention, the Montreal Agreement or limitation of liability. Plaintiff contends Eastern is now barred from invoking the limitation of liability of Warsaw/Montreal because of its failure to reserve this right in the contribution agreement.

 Neither the Warsaw Convention nor the Montreal Agreement prohibit contribution agreements between the carrier and a third party or require the carrier to reserve its rights under the Convention. If the contract between the passenger and the carrier provides that Warsaw/Montreal may apply, the carrier as of right may invoke its provisions. Eastern exercised this right in its answer to plaintiff's complaint filed in November, 1975.[52] The agreement existing between Eastern and the United States in no way affects any of the rights and remedies available to the plaintiff under the Convention or the duties and obligations owed to plaintiff by Eastern. It neither relieves Eastern of liability nor lowers the limit of liability nor creates a "special contract" raising or eliminating the limit of liability. Essentially, it is the latter which plaintiff contends resulted from the contribution agreement entered into between Eastern and the United States.[53]

Under the Convention, the limitation of liability may be raised by "special contract" between the parties.[54] The contribution agreement between the United States and Eastern is not, however, such a "special contract." The same clarity of intent to

**48.** Deposition of W. T. Strain, Record, Doc. 42 at pp. 13, 14, 17–18, 20 and attached exhibits (EDLA).

**49.** Record, Doc. 44, "Domangue", Interrogatory 91 and Answer to Interrogatory 91 (EDLA); Deposition of Mrs. Domangue, April 2, 1981, Doc. 58, p. 10 (EDLA).

**50.** Convention, Article 25; *see* Aviation Tort Law, supra, note 26, at § 11:37.

**51.** The plaintiff has the burden of proving willful misconduct on the part of the carrier. *Berguido v. Eastern Airlines, Inc.*, 317 F.2d 628, 629 (3rd Cir.), *cert. den.*, 375 U.S. 895, 84 S.Ct. 170, 11 L.Ed.2d 124 (1963); *Grey v. American Airlines, Inc.*, 227 F.2d 282, 285 (2d Cir.), *cert.*

*den.*, 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1955). *See* Aviation Tort Law, supra, note 28 at § 11:37.

**52.** Record, Doc. 6 (EDLA).

**53.** *See Block v. Compagnie Nationale Air France*, 386 F.2d 323, 331–334 (5th Cir.), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1967); *Eck v. United Arab Airlines, Inc.*, 360 F.2d 804, 808 (2d Cir. 1966); *Dunn v. Trans World Airlines*, 589 F.2d 408, 410–413 (9th Cir. 1978).

**54.** Convention, Article 22(1).

alter the terms of the Warsaw Convention evident in the "special contract" included in the ticket by virtue of the Montreal Agreement, is not evident in the contribution agreement. The only reference to dollar amounts is the paragraph wherein the parties agree the contribution of the United States to virtually all settlements and damage awards shall not exceed 12 million dollars. The remainder of the agreement provides for the sharing of the cost of settlements, judgments, and expenses regardless of what these should be.

This agreement has no effect whatsoever on the plaintiff. Once Warsaw/Montreal is found to apply to the case, as we have found, Mrs. Domangue must prove her recoverable damages, which damages, however, may not exceed $75,000. Within that limit, any damage award received by Mrs. Domangue will be satisfied by the defendants and they, in turn, will be left to their own devices for sharing the expense.

For the foregoing reasons, the Warsaw Convention as supplemented by the Montreal Agreement applies to this case and Eastern is absolutely liable to the plaintiff for provable damages in a sum not to exceed the sum of $75,000.

## II.

Two other motions were taken under submission following oral argument on August 19, 1981. Plaintiff has moved to submit certified copies of transcript excerpts from the case entitled *Georgakis v. Eastern Airlines*, 512 F.Supp. 330, E.D.N.Y., and Eastern has moved to prohibit use of this testimony, which motion was regarded by the court as an opposition to plaintiff's motion.[55]

The testimony of Grigoris Georgakis does not show what the decedent experienced or may have experienced either prior to or at the time of the crash or subsequently; Mr. Georgakis' experience was not necessarily similar to that of Mr. Domangue. Hence, his testimony is irrelevant and inadmissible.[56]

The testimony of Mr. Georgakis is also irrelevant with respect to the question of damages recoverable against the United States for the reason that the issue of personal injuries suffered by the decedent is no longer before the court. We previously granted the motion of the United States to reduce the *ad damnum*, thereby removing the issue of damages recoverable against the United States for personal injuries suffered by Mr. Domangue from the case.

For the foregoing reasons, Eastern's motion for partial summary judgment is GRANTED and, in conjunction therewith, the documents ordered produced *in camera* to Judge Edward J. Boyle, Sr., pursuant to the magistrate's Minute Entry of May 13, 1981, are hereby ordered placed in the record of these proceedings; plaintiff's motion to submit certified copies of excerpts of the transcript of the Georgakis testimony is DENIED; and Eastern's motion to prohibit use of said testimony is GRANTED.

**55.** Record, Doc. 49 (EDLA).

**56.** Fed.Evid. 401, 402 (1981).

## APPENDIX A

**Machine Composition.** Machine composition provides a faster means for the setting of type because it takes the handwork out of the typographic function. Four mechanical typesetting systems exist today for the production of relief type. They are Linotype, Intertype, Monotype, and Ludlow. All are referred to as hot-metal systems because they do not actually set type, but rather cast type from molten metal.

Linotype and Intertype machines are characterized by their ability to cast a line of type as a single piece of metal, which is called a slug. These machines consist of four main parts: keyboard, magazine, casting mechanism, and distributor. The keyboard is operated much like that of a typewriter. When the operator strikes a letter, a mold, or matrix, which is used as a pattern for casting that letter, is released from its storage receptacle, or magazine. Complete lines of matrices are composed in this manner and mechanically transferred to the casting mechanism. There, molten metal is forced into the matrices and instantly cooled. The finished slug is then ejected from the machine, and the individual matrices are mechanically distributed back to their respective locations in the magazine. The lines of type are mechanically "justified," or adjusted to the required length, by inserting wedges, called spacebands, between the words to extend the lines to the proper measure before casting.

The Monotype system, on the other hand, casts single foundry-type characters, as opposed to solid slugs. Two separate machines are used, the keyboard and the caster. As the keyboard operator strikes the letters he wants to cast, a paper tape is perforated with a coded symbol. When this tape is fed into the caster, the perforations trigger the positioning of a die case. The die case contains a matrix for every letter of the alphabet and, as each letter is called for by the tape, its matrix is moved into casting position.

Linotype, Intertype, and Monotype machines are, for the most part, used for setting the smaller point sizes of type used for text matter. Ludlow, on the other hand, is designed primarily for production of large display type. The

Children 6 pt.

Children 8 pt.

Children 10 pt.

Children 12 pt.

Children 14 pt.

Children 18 pt.

Children 22 pt.

Children 24 pt.

Children 30 pt.

Children 36 pt.

**TEN SIZES** of the same type face. This design is named Caslon Old Style. The height of a piece of type is measured by points. One point equals nearly 1/72nd of an inch—common sizes used for the text of books are 8, 10, and 12 point type.

---

| WEIGHT |
| --- |
| This is Standard Light (12 point) |
| **This is Standard Bold (12 point)** |

| WIDTH |
| --- |
| This is Standard Light Condensed (12 point) |
| This is Standard Light Extended (12 point) |

PRINTERS HAVE a different font—a full set of capital letters, small letters, and symbols—for each point size of a type face. For most type faces they also have fonts of varying weights and widths. Bold face type (second from the top) may be used for emphasis; the difference in width between condensed and extended type is also shown.

Ludlow machine combines the techniques of both hand and machine composition. Hand-assembled lines of matrices are inserted into the casting device and mechanically cast into solid slugs.

The advantages of mechanized typesetting over hand composition are numerous. First, mechanized typesetting is a much faster process. Second, it is a simpler process in a number of ways. For instance, hand-set type must not only be set but must also be distributed by hand. Finally, because the metal from machine-composed type is remelted and remolded into new type for every job, the printer does not face the problem of using type that has been damaged through continual wear.

**Photoengraving.** Not all letterpress printing is done from type characters. Frequently, artwork or photographs must accompany the text matter. Such illustrative material, for letterpress use, is reproduced from photoengraved plates, or photoengravings.

Photoengravings, so called because they are produced by a photographic process, are classified into three categories: line plates, halftone plates, and combination plates. The line plate gets its name from its ability to reproduce pen-and-ink (line) drawings, hand lettering, ruled forms, diagrams, etc. The illustration to be reproduced is photographed, and the resulting negative is placed over a metal plate, the surface of which has been coated with a water-soluble light-sensitive solution. Light generated by a high-power lamp passes through the transparent portions of the negative, and in those areas hardens the coating underneath. Where the opaque areas of the negative prevent light from reaching the plate, the coating remains water-soluble and is washed away, leaving the bare metal exposed. The hardened image area is then made insensitive to acid, and the entire plate is subjected to a corrosive etch that eats away the exposed bare metal, thus leaving the acid-resistant image area in relief.

Line plates are the simplest and least expensive photoengravings to produce. Their use, however, is restricted to those illustrations that are rendered in solid lines and areas of black. The halftone plate, on the other hand, is able to reproduce photographs, drawings, and other such material composed of intermediate shades of gray.

To understand how the halftone plate works, it is necessary first to understand that a printing press can only lay down one uniform shade of ink. Tailoring the density (tone) of that shade to match those of the illustration being