Mrs. Evelyn H. DOMANGUE, Individually and On Behalf of the Minors, Rarry Joseph Domangue, Jr. and Michelle Marie Domangue, Plaintiffs-Appellants,

v.

EASTERN AIR LINES, INC., et al., Defendants-Appellees.

No. 82–3515.

United States Court of Appeals, Fifth Circuit.

Jan. 13, 1984.

St. Martin & St. Martin, Michael X. St. Martin, Julia Taylor, Houma, La., for plaintiffs-appellants.

Deutsch, Kerrigan & Stiles, Francis G. Weller, Marc J. Yellin, New Orleans, La., for defendants-appellees.

Before INGRAHAM, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Mrs. Evelyn Domangue, individually and on behalf of her two minor children, appeals from a judgment holding that the Warsaw Convention and Montreal Agreement limit her recovery from Eastern Airlines for the death of her husband to a total of $75,-000.00, including any post-judgment or pre-judgment interest. *Domangue v. Eastern Airlines, Inc.,* 542 F.Supp. 643 (E.D.La. 1982). We affirm the judgment that the Warsaw Convention and Montreal Agreement are applicable to this case, but uphold the right to award post-judgment and pre-judgment interest in addition to the $75,-000.00 maximum designated by the Montreal Agreement. We remand in accordance with our opinion.

## I. FACTS

On June 24, 1975, Eastern Airlines Flight 66 crashed near John F. Kennedy International Airport en route from New Orleans. Passenger Barry Domangue, traveling under an international ticket to a foreign destination, was killed in the crash. His widow, Evelyn Domangue, on her own and her children's behalf, sued both Eastern Airlines and the United States.[1] Mrs. Domangue sued the United States of America under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.,* and the United States stipulated its liability while this action was still pending in the Eastern District of New York. The actual amount of damages was not determined until the case was transferred to the Eastern District of Louisiana, however. Defendant Eastern Airlines moved for partial summary judgment once the case was transferred on the ground that there was no genuine issue of material fact as to whether the Warsaw Convention, as modified by the Montreal Agreement,[2] lim-

---

1. An account of the extremely complicated procedural history of this case may be found in *Domangue v. Eastern Airlines, Inc.,* 531 F.Supp. 334, 335–37 (E.D.La.1981).

2. The official title of the "Warsaw Convention" is the "Convention for the Unification of Certain Rules Relating to International Transportation by Air," 49 U.S.C. § 1502 *et seq.* The official title of the "Montreal Agreement" is the "Agreement Relating to Liability Limitation of

ited its liability in this case.[3] The district court held that Warsaw/Montreal was applicable, and limited Eastern's liability to $75,000.00. *Domangue v. Eastern Airlines, Inc.*, 531 F.Supp. 334, 337 (E.D.La.1981). Approximately seven years after the crash, a trial by jury was finally held and damages in the amount of $639,446.50 were found. Eastern's liability was limited to $75,000.00, and the United States paid the remaining $564,446.50. Post-judgment interest on the $564,446.50, and costs as provided by law, were assessed against the United States. 542 F.Supp. at 654. The court ruled that no pre-judgment or post-judgment interest could be assessed against Eastern, however, since the amount of interest would raise the airline's liability above the $75,000.00 ceiling set by the Montreal Agreement. *Ibid.*

## II. Applicability of Warsaw/Montreal

In 1934, the United States agreed to adhere to the Warsaw Convention. The treaty, according to Article 1, was to govern the rights and responsibilities of carriers with respect to the international transportation, for hire or gratis, of persons, baggage or goods. In the event of death or bodily injury to a passenger, the carrier would be presumed liable "if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."[4] A carrier's liability, however, would be limited to a maximum damage recovery of 125,000 Poincare francs,[5] or $8,300, unless the passenger could prove willful misconduct on the part of the airline. In such a case liability would be unlimited.[6] Liability would not lie if the carrier could show it had "taken all necessary measures to avoid the damage or that it was impossible ... to take such measures"[7] or show "the damage was caused by or contributed to by the negligence of the injured person...."[8]

In 1965 the United States announced its denunciation of the Convention, to take effect in six months, because of its low damage recovery limitation. *See* 49 U.S.C. § 1502, at 437. To prevent the impending denunciation, in 1966 the principal international air carriers,[9] in the Montreal Agreement, modified the effects of the Warsaw Convention as it applied to flights involving a location in the United States. The signatory carriers agreed by special contract to waive the defenses available to them under Article 20(1) and to increase the maximum recoverable damage award.[10] Thus, under the Agreement, "liability for injuries described by Article 17 of the Warsaw Con-

---

the Warsaw Convention and the Hague Protocol," 49 U.S.C. § 1502, at 437–38. For the sake of brevity, we will refer to the agreements as either the "Warsaw Convention," "Montreal Agreement," or simply "Warsaw/Montreal."

As will be discussed later in this opinion, in the absence of certain specific defenses the Warsaw Convention made an airline strictly liable for actual damages resulting from a passenger's injury or death up to $8,300.00, but limited the airline's liability to that sum. The Montreal Agreement raised the ceiling on liability from $8,300.00 to $75,000.00 and waived certain defenses available under the Convention.

3. In the Eastern District of New York Mrs. Domangue had herself asked for judgment on that basis. Judgment had been granted, and Eastern Airlines appealed on procedural grounds, claiming that Mrs. Domangue had not established her capacity to sue. Before transfer of the case to the Eastern District of Louisi-

ana, the parties stipulated Mrs. Domangue's capacity to sue. In Louisiana, however, Mrs. Domangue opposed the application of the Warsaw/Montreal limitations of liability.

4. Warsaw Convention, 49 U.S.C. § 1502, Article 17, at 433.

5. *Id.*, Article 22(1), (4), at 434.

6. *Id.*, Article 25.

7. *Id.*, Article 20.

8. *Id.*, Article 21.

9. Eastern Airlines was one of the signators. *See* S. Speiser and C. Krause, *Aviation Tort Law* § 11:19, n. 27 (1978).

10. Montreal Agreement, 49 U.S.C. § 1502, at 437.

vention became absolute and the maximum damages were increased to $75,000.00."[11]

The Warsaw/Montreal system of absolute liability for the carrier up to $75,000.00 per passenger, regardless of any fault or negligence, applies in a given case if: (a) the passenger's travel was "international transportation" within the meaning of Article 1(1), (2); (b) the passenger ticket was "delivered" within the meaning of Article 3(1), (2) and contained a statement in 10 point type that the transportation was subject to the rules relating to liability established by Warsaw/Montreal; (c) the accident which caused the damage took place on board the aircraft or in the course of any of the operations of embarking or disembarking;[12] (d) the passenger did not contribute to the accident;[13] and (e) the damage was not caused by the willful misconduct of the carrier.[14]

In the district court it was not disputed that Barry Domangue, the deceased, was a passenger in "international transportation," that the accident occurred aboard the aircraft, and that Mr. Domangue in no way contributed to the accident. What was disputed by Mrs. Domangue was whether her husband's airline ticket had contained the required notice of the Warsaw/Montreal limitations of liability, and whether Eastern was guilty of willful misconduct. Mrs. Domangue does not argue on appeal the issue of Eastern's alleged willful misconduct. The only question concerning the application of Warsaw/Montreal is whether it was proper for the district court to take from the jury the fact question of whether Mr. Domangue's ticket had the requisite notice.

It is proper to grant a motion for summary judgment only when there is no genuine issue of material fact, *McKee v. McDonnell Douglas Technical Services Co.,* 700 F.2d 260, 262 (5th Cir.1983). We find

that there is no genuine fact issue here and that the district court was correct in granting Eastern Airline's motion for partial summary judgment holding the Warsaw Convention and Montreal Agreement applicable. Eastern did not have to prove that Mr. Domangue had actual knowledge of the limitations of liability imposed by Warsaw/Montreal.[15] All that Eastern needed to prove was that a ticket was delivered to Mr. Domangue which gave him a reasonable *opportunity* to learn of the limitations and take steps to obtain additional protection if he wished to do so. *Warren v. Flying Tiger Line, Inc.,* 352 F.2d 494, 497–98 (9th Cir.1965); *Mertens v. Flying Tiger Line, Inc.,* 341 F.2d 851, 856–57 (2d Cir. 1965).

Mr. Domangue's airline ticket was never recovered from the crash, so the district court was not able to examine the ticket. Eastern Airlines was able, however, to produce the coupon the airline had detached from Mr. Domangue's ticket when he boarded. The serial numbers on that coupon indicated during which print run the ticket had been printed. Eastern was able to produce a complete ticket from the same print run as Mr. Domangue's ticket, 531 F.Supp. at 339, which contained the notice concerning the limits to liability imposed by Warsaw/Montreal. Since the notice on that ticket was adequate to invoke the limitations of liability provided by Warsaw/Montreal, the only reasonable inference was that the notice on Mr. Domangue's ticket was also adequate to warn Mr. Domangue.

Mrs. Domangue argues that Eastern failed to prove that the warning had actually been attached to her husband's ticket, and not accidentally detached by the ticket agent when her husband had picked up his

---

11. *Day v. Trans World Airlines,* 528 F.2d 31, 33 (2d Cir.1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

12. Warsaw Convention, 49 U.S.C. § 1502, Article 17, at 433.

13. *Id.,* Article 21 at 434.

14. *Id.,* Article 25.

15. Since Mr. Domangue had made several previous international trips it is probable that he was aware of the Warsaw/Montreal limitations. His actual knowledge is not the issue, however. What is important is whether the airline afforded him the opportunity to learn of the limitations.

ticket before going to the gate. Mrs. Domangue provided no reason for believing that to have been the case, and Eastern Airlines pointed out that the page on which the Warsaw/Montreal notice was printed was not perforated, and could not have been easily detached. In the face of this argument as well, the only reasonable inference is that the warning was an integral part of Mr. Domangue's ticket.

In light of the fact that Mrs. Domangue could counter with nothing but speculation the evidence indicating Mr. Domangue received a ticket with a valid Warsaw/Montreal notice, we affirm the district court's finding that there was no genuine fact question as to whether Mr. Domangue received proper notice of the Warsaw/Montreal limitations. Since it was not contested that the other conditions for invoking the limitations of Warsaw/Montreal were met, it was proper for the district court to hold that the Warsaw Convention and Montreal Agreement were applicable to this case.

### III. Interest in Addition to the $75,000.00 Award

The district court held that pre-judgment and post-judgment interest could not be awarded in addition to the $75,000.00 maximum prescribed by the Montreal Agreement. It found that "[p]rejudgment and post-judgment interest are a measure of damages, and the clear intent of Article 22 is to limit recoverable damages to $75,-000.00." 542 F.Supp. at 653. In attempting to ascertain the intent of the parties to the Warsaw Convention, the court relied on Secretary of State Cordell Hull's statement in transmitting the Warsaw Convention to the Senate in 1934 that the purpose of the then $8,300.00 liability limitation was "to fix at a definite level the cost to airlines of damages sustained by their passengers and of insurance to cover their damages." *Ibid.*

The district court went on to support its position that no air carrier should have to pay more than a total of $75,000.00 by citing *Reed v. Wiser*, 555 F.2d 1079, 1089 (2d Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). In that case, the court stated that "at no time has this country ever abandoned the basic principle that, whatever the limits may be, air carriers should be protected from having to pay out more than a fixed and definite sum for passenger injuries sustained in international air disasters." The Second Circuit's statement in *Reed* is not directly applicable to this case, however, because the court was not considering the question of awarding interest.

*Reed* involved the personal representatives, heirs, and next of kin of airline passengers killed in a crash suing individually the corporate officers of the air carrier. The plaintiffs attempted thus to avoid the limitation of liability imposed by the Montreal Agreement. Although an airline carrier's "agents" were mentioned in parts of the Convention, Warsaw/Montreal had not made it plain that employees of the air carrier were protected by the limitations. Plaintiffs sought to apply domestic law in their suit against the employees instead of the uniform law created by the Convention.

The Second Circuit ruled that the Warsaw Convention should be construed to extend the Convention's liability limitations to passenger claims against employees. The extension was necessary in order to protect airlines who would otherwise be forced to indemnify employees from massive damage awards, and to preserve "the Convention's most fundamental objective of providing a uniform system of liability and litigation rules for international air disasters...." 555 F.2d at 1092. In *Reed*, then, the court was faced with allowing suits which circumvented the liability limits or construing the Convention to apply to an air carrier's employees. The court was not faced with the much narrower question of whether interest calculated on the fixed and definite sum of $75,000.00 and awarded in addition to $75,000.00 would be inconsistent with the purposes of Warsaw/Montreal. It appears that no circuit court has yet squarely addressed that issue.

### A. Objectives of Warsaw/Montreal

Examination of the legislative history of the Warsaw Convention and Montreal Agreement is critical in attempting to an-

swer this question. As we observed in *Block v. Compagnie Nationale Air France,* 386 F.2d 323, 336 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968), "[w]e feel ... that the determination in an American court of the meaning of an international convention drawn by continental jurists is hardly possible without considering the conception, parturition, and growth of the convention." We have made a careful examination of the history of the development and adoption of the Convention. We find it clear that the dominant objective was to permit the growth of an infant industry by setting limits of liability. Such limits would make affordable insurance to protect air carriers. It would also subsequently decrease the cost of transporting passengers. That was the purpose referred to in Secretary of State Cordell Hull's message to the Congress, upon which the district court based its decision.

As early as the 1955 conference at The Hague, however, the United States had made known that it was interested in more substantial recoveries for the injured parties or their survivors. A. Lowenfeld & A. Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497, 507 (1967).[16] Since attorneys' fees and court costs reduced the amount actually received by the plaintiff, the United States proposed that Article 22 of the Warsaw Convention be amended to allow the award of litigation expenses, including attorneys' fees, in addition to the primary award. The primary award was limited at that time to $16,000.00. Article 22(4) of the Warsaw Convention was eventually amended to reflect the proposal, *ibid.,* although there was opposition because the provision was regarded as unnecessary—"[n]o one outside the United States had previously thought that the Warsaw Convention prevented a charge on the defendant for the plaintiff's costs." *Id.* at 507–09.

After a time it was realized that the provision was not effecting its purpose. Personal injury litigation in the United States was financed primarily by contingent fee arrangements, and courts simply did not award extra for legal costs although it had been made clear by the amendment that they were permitted to do so. Thus the conclusion was reached that to leave a reasonable sum for the plaintiff after legal fees and court costs had been deducted, the limitation on liability had to be raised to allow for higher initial damage awards. *Id.* at 561–63. At the Montreal Conference the attorney fees provision was eventually deleted, as a bargaining concession made to ensure a higher limitation on liability, the major goal of the conference.

The first objective of the Montreal Agreement was achieved, then, by the increase in liability to a maximum of $75,-000.00. The greatly increased upper limit of liability meant that victims of air disasters and/or their survivors would be afforded the opportunity to recover a much higher proportion of their damages. Indeed, the 1966 Montreal Conference was prompted by the United States' notice that it would denounce the Warsaw treaty if the limitations of liability were not revised to compensate more adequately victims and survivors. *Id.* at 550.

At the Montreal Conference there was an important additional American objective. It was to encourage the speedy disposition of claims. By this means the victims of an air crash or their survivors would receive the money when it was most needed. *Id.* at 570–71. To that end the United States co-sponsored the plan which eliminated the issue of fault in establishing liability. The United States argued that doing so would "avoid the need to delay settlement negotiations until accident investigation had been completed, and would greatly speed up and probably reduce the cost of any litigation." *Id.* at 570–71, 593, 600. That principle of absolute liability was eventually adopted in

---

**16.** Lowenfeld and Mendelsohn were among the American delegates to the Montreal Conference.

the Montreal Agreement. *See* 49 U.S.C. § 1502, at 437.

## B. Post-Judgment Interest

In determining whether an award of interest above and beyond the $75,000.00 limitation of liability is permitted by the Warsaw Convention, as modified by the Montreal Agreement, we must balance the objective of maintaining a fixed and definite level of liability with the objectives of encouraging the speedy compensation for damages and the maximum recovery for injured parties or their survivors. We find that the objectives of the Warsaw/Montreal legislation are well served by allowing the payment of post-judgment interest above and beyond the $75,000.00 limit to liability established by the Montreal Agreement. Because the amount of any interest is easily calculable, and depends only on the legal rate of interest and the amount of time that the defendant delays in compensating the injured party, we find that air carriers are still provided with a definite basis for determining their liability. The amount of interest to be awarded may vary from case to case since cutting off the accumulation of interest due by settling, satisfying a judgment, or depositing the money into escrow is within the air carrier's control. But the air carrier cannot complain that its level of liability has been artificially inflated. Rather, the objective of encouraging the payment of judgments when the victim or his survivors most need help is furthered. In addition, the relatively routine policy of requiring interest on judgments is applied. After judgment the money belongs to the person who was awarded judgment. Interest on money withheld is properly charged.

The district court and appellants point to the provision of the Montreal Agreement which specifies that legal fees and costs are to be included in the $75,000.00 limit. The intent of the provision is clear since in those countries in which fees and costs are awarded separately, the limit of recovery for damages is $48,000.00. Appellants argue that by the same reasoning interest must also be included in the $75,000.00 limit. In light of the history of that provision, however, we find to the contrary that it supports the award of interest in addition to the judgment. As noted previously, legal fees earlier had specifically been allowed to be awarded in addition to the base judgment; the provision was changed to take into account the practice of American courts, which was not to award legal fees separately. The ceiling on awards was then raised in part to allow the inclusion of legal fees. It is accepted practice, however, for American courts to award post-judgment interest in addition to a judgment. *See* 28 U.S.C. § 1961. Therefore there was no reason for the ceiling on liability to take into account the cost of interest. In the absence of any indication that the Montreal Agreement mandates otherwise, we conclude that it is proper to award post-judgment interest in a Warsaw/Montreal case. Legal fees and court costs were specifically listed as included in the $75,000.00 limit and interest was not. In short, if the drafters of the Montreal Agreement had wanted interest to be included within the $75,000.00 limitation, they could have so stipulated.

## C. Pre-Judgment Interest

Although the award of pre-judgment interest is not as common as the award of post-judgment interest, we conclude that it is proper under Warsaw/Montreal. We recognize the general rule in common law was that pre-judgment interest could not be allowed on an unliquidated tort claim, *National Airlines, Inc. v. Stiles,* 268 F.2d 400, 405 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959). Some states have enacted this rule by statute. *See, e.g.,* La.Rev.Stat.Ann. § 13:4203 (West 1968). We are bound neither by common law nor state statutes, however, since the Warsaw Convention and Montreal Agreement were intended to act as a uniform international law which supplants each member nation's varied laws. *Block v. Compagnie Nationale Air France,* 386 F.2d 323, 337–38 (5th Cir.1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).

Although we are not bound by such law, we find it helpful to note that while many

decisions still state the common law rule, there has been a general willingness on the part of courts to award interest when justice and fairness so require, even though the claim is unliquidated. 22 Am.Jur.2d § 181 (1965). For instance, Texas allows pre-judgment interest upon unliquidated claims, whether they arise out of tort or breach of contract, when the measure of the recovery or claim, and not necessarily the amount of damages, is fixed by the conditions existing at the time the injury arose. *McDaniel v. Tucker,* 520 S.W.2d 543, 549 (Tex.Civ.App.—Corpus Christi, 1975).

We have ourselves stated that pre-judgment interest should be an ingredient of back pay in Title VII cases, *see, e.g., Whiting v. Jackson State University,* 616 F.2d 116, 127 n. 8 (5th Cir.1980); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 263 (5th Cir.1974), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), in order to put plaintiffs more nearly in the position in which they otherwise would have been absent discrimination. Similarly, in unfair labor practice cases, we regularly grant pre-judgment interest on back pay awards in order to make plaintiffs whole. *Winn-Dixie Stores, Inc. v. N.L.R.B.,* 413 F.2d 1008, 1010 (5th Cir.1969); *N.L.R.B. v. American Compress Warehouse,* 374 F.2d 573, 575 (5th Cir.1967).

In a case involving the right to "suspense money" collected by a gas pipeline company during pendency of a rate increase, we decided that the party who was eventually found to be entitled to the suspense money was entitled to the interest earned by that money from the time it was collected until the date of approval of the increase, even though that party was not legally entitled to the suspense money until the rate increase was finally approved. *Phillips Petroleum Co. v. Adams,* 513 F.2d 355 (5th Cir.), *cert. denied,* 423 U.S. 930, 96 S.Ct. 281, 46 L.Ed.2d 259 (1975). Phillips Petroleum Company, which had collected and held the suspense money pending determination of the rate increase, was denied the benefit of the income from the money "not because Phillips has done anything wrong, but because Phillips ought not to be able to use someone else's money as it pleased for ten years, thereby enjoying a very considerable benefit, and then pay nothing for the use of the money." *Id.* at 368. We stress that in the present case Eastern did not pay any money either to the plaintiff or into court until some time after its motion for summary judgment was granted on November 24, 1981. Eastern thus had the use of $75,-000.00 to which Mrs. Domangue was entitled for the period of more than six and a half years.

It is a general rule in admiralty that the award of pre-judgment interest on unliquidated claims is left to the discretion of the court. *United States v. M/V Zoe Colocotroni,* 602 F.2d 12, 14 (1st Cir.1979); *Doucet v. Wheless Drilling Co.,* 467 F.2d 336, 340 (5th Cir.1972). We have previously allowed pre-judgment interest in an airplane crash case brought in admiralty under the Death on the High Seas Act. In *National Airlines, Inc. v. Stiles,* 268 F.2d 400, 405 (5th Cir.), *cert. denied,* 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959), we held that because the value of plaintiff's loss was computed as of the time of the crash but the judgment was not paid until much later, an award of pre-judgment interest was the only way to compensate plaintiff for the full value of her pecuniary loss. The district court distinguished *Stiles* because the goals of the Death on the High Seas Act and the Warsaw Convention and Montreal Agreement differed. 542 F.Supp. at 654. The Death on the High Seas Act, the court noted, called for a "fair and just compensation for the pecuniary loss sustained," whereas the goal of Warsaw/Montreal was to place a ceiling on the amount of damages recoverable from the carrier. *Ibid.*

Unlike the district court we here find that allowing victims a more adequate recovery and ensuring speedy disposition of claims were important objectives leading to the modification of the Warsaw Convention by the Montreal Agreement, *see* section III A, *supra.* We further find that awarding pre-judgment interest is permissible under the Warsaw/Montreal body of law and is within the discretion of the court. We are

also influenced by the inequity of Eastern Airlines benefiting from the length of time between the crash and a final judgment in this case, to the detriment of decedent's survivors. We expressed similar concerns in *Phillips Petroleum, supra.*

Factors for the court to consider in deciding whether to award pre-judgment interest thus may include the length of time between the tort and judgment, and whether the defendant caused or contributed to any delay. A potential award of pre-judgment interest advances the objective of encouraging speedy compensation to victims, and ensures that the aim of obtaining a high recovery for victims and their survivors is not defeated by a defendant's simple strategy of delaying payment or judgment until the award is diminished in actual value. We agree with the Supreme Court of New Jersey's reasoning in *Busik v. Levine* that the allowance of pre-judgment interest on an unliquidated tort claim will induce prompt defense consideration of settlement possibilities. 63 N.J. 351, 307 A.2d 571, *app. dism'd*, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973). It is also likely to discourage delay if the case is taken to court. Allowing such interest does not defeat the objective of establishing a limit to liability so that air carriers may find companies willing to insure them, since air carriers may avoid significant interest charges by avoiding delay in the disposition of claims.

We conclude that post-judgment and pre-judgment interest may properly be awarded in addition to the $75,000.00 limitation on judgments contained in the Warsaw Convention and Montreal Agreement. Having freed the district court from this limitation we remand the case in order to allow the district court to exercise its proper discretion in the awarding of interest.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.