**MOTOROLA, INC., a corporation; Fireman's Fund Insurance Company, a corporation, Plaintiffs–Appellees,**

v.

**FEDERAL EXPRESS CORPORATION,**
**Defendant,**

and

**Kuehne & Nagel, Inc., Defendant–Appellant.**

No. 00–17374.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 2002.

Filed Oct. 16, 2002.

Stephen R. Ginger, Condon & Forsyth, Los Angeles, CA, for the defendant-appellant.

Michael J. Cummins, Gibson & Robb, San Francisco, CA, for the plaintiffs-appellees.

Before REINHARDT and FISHER, Circuit Judges, and MOLLOY, District Judge.[*]

FISHER, Circuit Judge:

In this appeal, Kuehne & Nagel, Inc. ("K&N") challenges the district court's award of $244,080 and prejudgment interest to Motorola, Inc. Motorola brought claims under the Warsaw Convention arising out of damage to cargo sustained during transit from Texas to Japan after it hired K&N to transport the cargo. K&N principally contends that the district court erred in determining the liability limitation based on the weight of the entire shipment rather than only on the weight of the damaged component; that, in any event, the damaged portion of the shipment did not affect the value of the remainder of the shipment; and that prejudgment interest is not allowable under the Warsaw Convention. We disagree. We hold that Article 22 of the Warsaw Convention provides for liability limitation based on the entire weight of the shipment where, as here, the damaged portion of the cargo affects the value of the entire shipment. Additionally, we hold that prejudgment interest is available under the Warsaw Convention and that the district court properly awarded

such interest to make full restitution to the injured party.

## FACTUAL AND PROCEDURAL HISTORY

Motorola, an electronics equipment manufacturer, hired K&N, an indirect carrier and freight forwarder, to transport a cellular telephone base station system, valued at almost five million dollars, from Dallas, Texas to Tokyo, Japan. Motorola hired another company, Relocation Services, Inc., to package the cargo into approximately 20 crates for shipping. K&N then arranged for Federal Express ("FedEx"), a direct air carrier, actually to transport the cargo via airplane to Tokyo. Between July 10 and 15, 1997, FedEx transported the cargo in a series of six flights. K&N issued a single air waybill covering the entire shipment and stating that there was no apparent damage to the cargo prior to transport. When the cargo arrived at the airport in Tokyo, K&N noted that a portion of the cargo was damaged. Upon receipt of the cargo, Motorola found that the damaged crate contained the system's cabinet-like common control frame, which consisted of printed circuit board cards and wiring. Motorola was forced to replace the equipment at a cost of $459,330.70 and waited six weeks for the replacement's arrival. The total weight of the shipment was 12,204 kilograms. The weight of the damaged crate was approximately 680 kilograms.

Motorola and Fireman's Fund Insurance Company, Motorola's insurance carrier, subsequently filed suit in California state court against K&N and FedEx, alleging breach of contract and negligence. After

---

[*] The Honorable Donald W. Molloy, Chief Judge, United States District Court for the District of Montana, sitting by designation.

FedEx removed the case to federal court, K&N filed a cross-claim for indemnity and contribution from FedEx and all parties subsequently filed for summary judgment.[2] The court granted partial summary judgment for K&N, finding the cargo suffered at least some damage while in FedEx's custody. Additionally, the court ruled that, under the Warsaw Convention, the liability limitation would be calculated according to the weight of the entire shipment—and not just that of the damaged portion—if Motorola proved at trial that the damaged portion of the cargo affected the value of the entire shipment.[3] The court left for trial the questions of whether the overall shipment was affected and the extent of damage done to the property.

The district court conducted a two-day bench trial. After Motorola presented its case, K&N rested without presenting any evidence. The court found in favor of Motorola and awarded damages of $244,080, based on the weight of the entire shipment, and subsequently awarded Motorola prejudgment interest. On appeal, K&N challenges both damages and the award of prejudgment interest. We affirm on all counts.

## DISCUSSION

### I. Liability Limitations

#### A. Affected Weight Standard

The parties agree that this action falls within the parameters of the Warsaw Convention, an international treaty governing the liability that arises from the "international transportation of persons, baggage or goods performed by an aircraft for hire." *See* Warsaw Convention for the Unification of Certain Rules relating to International Transportation by Air, October 12, 1929, art. 1, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* note following 49 U.S.C. § 40105. "The Convention creates a presumption of air carrier liability but, in turn, substantially limits that liability." *Ins. Co. of N. Am. v. Fed. Express Corp.*, 189 F.3d 914, 917 (9th Cir.1999); *see Dazo v. Globe Airport Sec. Svcs.*, 295 F.3d 934, 937–38 (9th Cir.2002). The Convention sets forth uniform rules of liability for loss, damage or delay of international shipments by air, and embodies a tradeoff between the interests of carriers and shippers. Among its provisions is the rule that cargo carriers are entitled to a limitation of liability based on the weight of the shipment, presently set at $20 per kilogram. *See Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 255, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984); Warsaw Convention art. 22. The relevant section of Article 22 provides:

> In the transportation of checked baggage and of goods, the liability of the carrier shall be limited to a sum of 250 francs [$20] per kilogram, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of the value

---

**2.** Prior to trial, K&N settled with FedEx and dismissed its cross-complaint.

**3.** The parties incorporated this theory of calculation in a joint final pre-trial order. The judge and counsel for all parties signed the order and agreed that certain legal issues were resolved by the summary adjudication order and on both the factual and legal issues to be resolved at trial. In that order, the parties agreed that the method for calculating damages was one of the legal issues that

already had been resolved by the summary adjudication order:

> If it is shown at trial that the damage to the shipment rendered the entire system inoperable and caused the construction or operation of the shipped system to be delayed for a period of several weeks, then the proper weight to be considered under Article 22(2) of the Warsaw Convention is the total weight of the shipment.

at delivery and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless he proves that that sum is greater than the actual value to the consignor at delivery.

Art. 22(3).[4] The Convention preempts state and federal claims falling within its scope. *See id.* at art. 24 (stating that claims for personal injuries, for damage to, or loss of, baggage or goods and for damages occasioned by travel delays, "however founded, can only be brought subject to the conditions and limits set out in this convention.").

■■■ K&N argues that the liability limitation should be calculated based only on the weight of the damaged portion of the shipment. Motorola maintains, and the district court agreed, that the defendants' liability limitation under the Convention should be calculated based on the weight of the entire shipment, approximately 12,204 kilograms, and not simply the weight of the damaged crate, approximately 680 kilograms.[5] The text and drafting history of the Warsaw Convention are silent on this question. Accordingly, we may look to, among other things, evidence of the postratification understanding of the Convention's contracting parties to determine whether the Convention includes the "affected weight standard." *El*

*Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155, 167, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999); *Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 134, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989); *Hosaka v. United Airlines,* 305 F.3d 989, 993–94 (9th Cir. 2002).

Under the 1955 Hague Protocol, which amended the Warsaw Convention, the affected weight standard is made an explicit part of Article 22.[6] It states:

> In the case of loss, damage or delay of part of registered baggage or cargo, or of any object contained therein, the weight to be taken into consideration in determining the amount to which the carrier's liability is limited shall be only the total weight of the package or packages concerned. Nevertheless, *when the loss, damage or delay of a part of the registered baggage or cargo, or of an object contained therein, affects the value of other packages covered by the same baggage check or the same air waybill, the total weight of such package or packages shall also be taken into consideration in determining the limit of liability.*

Article 22(2)(b) (emphasis added).

The evidence suggests that the parties to the Hague Protocol understood the incorporation of the affected weight standard as a mere clarification of the Warsaw

---

**4.** Citations in this opinion are to the official United States translation of the Convention. *See* 49 Stat. 3014–23.

**5.** We review a district court's interpretation of treaties de novo. *United States v. Idaho,* 210 F.3d 1067, 1072 (9th Cir.2000), *aff'd,* 533 U.S. 262, 121 S.Ct. 2135, 150 L.Ed.2d 326 (2001). We review the district court's findings of fact for clear error. *See Freeman v. Allstate Life Ins. Co.,* 253 F.3d 533, 536 (9th Cir.2001).

**6.** The treaty is formally known as the Protocol to Amend the Convention for the Unification of Certain Rules Relating to International

Carriage by Air signed at Warsaw on 12 October 1929, Sept. 28, 1955, 478 U.N.T.S. 371. The Hague Protocol did not enter into force for the United States until the Montreal Protocol No. 4 was ratified by the Senate on September 28, 1998 and became effective on March 4, 1999—after the shipment at issue here. Accordingly, the Hague Protocol does not govern here, but we look to it as an amendment to the Warsaw Convention that may provide insight into the shared understanding of the Warsaw Convention's contracting parties.

Convention or, at any rate, that they understood the new language to be no less advantageous to the shipper than existing Warsaw Convention language. The minutes of the Hague Protocol say nothing to suggest that the new language expressly articulating use of the affected weight standard substantively changed the Convention. The carriers' own representative, the International Air Traffic Association, did not argue that the amended version substantively changed Article 22 by increasing the carriers' liability, only that it "had reached the conclusion that there was ambiguity in the present Convention as to problems of settlement for partial loss." *See* International Conference on Private Air Law: Vol. I, Minutes of Twentieth Meeting, Sept. 19, 1995 at p. 252. Moreover, the United States delegation opposed the amended version, and voiced its preference for the unamended version, because it believed the new version reflected a *decrease* in carriers' liability under Article 22. The delegation interpreted the unamended version to "[m]ean that when a passenger or shipper lost one of a number of articles being carried, he would think that he had available to him the entire liability of the carrier as determined by the total weight of the articles." *Id.* In hearings before the United States Senate Foreign Trade Committee on the Hague Protocol, the Federal Aviation Administration's acting administrator for International Aviation Affairs testified that with respect to changes in liability limitation, "there isn't any change between ... the Warsaw Convention and the Hague Protocol with respect to rates of recovery." *See* Hague Protocol to Warsaw Convention:

Hearings Before the Senate Comm. on Foreign Relations, 86th Cong., 1st Sess. 22 (1965). Given this history, we conclude that the additional language created by the Hague Protocol only clarified, and certainly did not expand, carrier liability with respect to the affected weight standard. The Hague proceedings evince that the contracting parties to the Warsaw Convention understood in 1955 that existing Article 22 incorporated—or, at the very least, was not hostile to—the affected weight standard.

Consistent with the understanding manifested at The Hague, federal courts to have considered this question have understood that the Warsaw Convention incorporates the affected weight standard. In *Deere & Co. v. Deutsche Lufthansa Aktiengesellschaft*, 621 F.Supp. 721 (N.D.Ill. 1985), *aff'd*, 855 F.2d 385 (7th Cir.1988), a case much like this one, a computer system sustained damage during transport. The district court considered "whether[defendant's] liability under Warsaw Convention Article 22(2) must be calculated with reference to the entire weight of the shipment or with reference only to the weight of the package specifically damaged." 621 F.Supp. at 721. A damaged "director frame"—a major component of the system—had rendered the computer system as a whole inoperable for several months, until a replacement could be acquired. Thus, the damage affected the value of the entire computer system. *Id.* The court calculated damages based on the total weight of the shipment, reasoning that the entire system was valueless without the damaged component. *Id.* at 722.[7] Other

---

7. In a prior memorandum opinion granting partial summary judgment, the district court in *Deere* had found: "If the damage to the director frame affects the value of the entire computer, Lufthansa's liability must be calculated with reference to the weight of the

entire computer shipment." *Deere & Co. v. Deutsche Lufthansa Aktiengesellschaft*, 621 F.Supp. 721 (N.D.Ill.1984). The court erroneously relied on the affected weight standard as set forth in the Hague Protocol's proposed amendment of Article 22, apparently in the

courts have accepted this proposition. *See, e.g., Arkwright Mut. Ins. Co. v. KLM Royal Dutch Airlines,* 1995 WL 491490, at *8 (S.D.N.Y. Aug. 17, 1995) ("The damage [in *Deere*] affected the value of the entire computer, and not just the part itself. Here, the lost container of pills had no effect on the value of the other four containers.... [W]hen lost goods comprise less than the entire shipment, and the remainder of the shipment is suitable for its intended use, the measurement used is the actual weight of the lost ... goods, not the weight of the entire shipment") (internal quotation marks and citations omitted); *Williams Dental Co., Inc. v. Air Express Int'l,* 824 F.Supp. 435, 443 (S.D.N.Y.1993) ("[W]hen the lost or damaged goods constitute less than the entire shipment, the Warsaw Convention's liability limitation applies to the actual weight of the lost or damaged goods, not the weight of the entire shipment. Recovery based on a shipment's gross weight is permitted only when damage to a portion of a shipment affects the value of the entire shipment.") (citations omitted), *aff'd,* 17 F.3d 392 (2d Cir.1993); *B.R.I. Coverage Corp. v. Air Canada,* 725 F.Supp. 133, 139 (E.D.N.Y. 1989) ("When, as in the instant case, only a portion of a shipment of goods is damaged, and the remainder of the shipment is suitable for its intended use, recovery is based on the weight of goods actually damaged. Recovery based on a shipment's gross weight is permitted only when damage to a portion of a shipment affects the value of the entire shipment.") (citations omitted); *Cf. Hartford Fire Ins. Co. v. Trans World Airlines, Inc.,* 671 F.Supp. 693, 694 (C.D.Cal.1987) (Tashima, D.J.) (limiting damages to items "actually lost or damaged" but citing *Deere* for proposition that "damage limitation calculated on basis of weight of entire shipment where damaged item affected value of entire shipment").

■ We think this understanding is sound. In light of the view of the Warsaw Convention reflected by the Hague Protocol and the rulings of other courts, we hold that, when a portion of a shipment is damaged in transit, the liability limitation under the Convention is based on the weight only of the damaged portion; but when the damaged portion affects the value and usability of other parts of the shipment, the liability limitation is based on the weight of all affected items in the shipment.

## B. Standard as Applied to this Case

■ Here, the district court found that the cellular base station "could not function at all" without the damaged control frame, concluding that the damaged component rendered the system "inoperable, useless and of diminished value." The court further found that little or no assembly could begin until the damaged control frame was replaced because it constituted the "heart and soul of the overall system and had a critical and central role in the overall system." Acknowledging that there was no direct evidence that the six-week delay in obtaining the replacement actually delayed the timetable for installation of the entire system, the court nevertheless determined that "a legitimate and reasonable inference can be drawn ...

mistaken belief the Protocol had been ratified by the United States at that time. The defendant did not seek to correct the court's mistake until the case was on appeal. The Seventh Circuit, however, did not reach the merits of the affected weight standard: "We express no opinion on the merits of the argument[that the affected weight standard is in-

applicable under the Warsaw Convention], because Lufthansa has waived it by not presenting it to the district court." 855 F.2d at 389. Nevertheless, as discussed in text, other courts have relied on *Deere* for the proposition that the affected weight standard is proper even under the unamended version of Article 22.

that the actual assembly was, in fact, delayed in this case by the length of time it took to get the replacement, meaning six weeks." K&N argues that the district court clearly erred in finding that the damaged control frame caused a delay in the installation of the station and thereby affected the value of the entire shipment. K&N contends that Motorola presented no evidence that the damage and resulting delay in construction in any way lowered the system's value and asserts that the proper liability limitation should therefore be based on the weight only of the control frame.

In making its factual findings, the district court relied on the testimony of Motorola project manager and engineer Gary Koepke. Koepke testified that it was not possible to construct the remainder of the station while awaiting the arrival of the replacement control board: "In some cases that's possible, but not with this one because this is one of the fundamental pieces. We have to start out with this one and before others at the very beginning and get that installed.... We can't do it later. It's the foundation for the rest of it." He stated that although "a couple of other frames" could be assembled, that process would take only one or two days "and then, you would have to stop and wait [for the control frame]." Koepke testified that a six-week delay in receiving the component—although a "quick" time frame in which to obtain a replacement—normally would delay installation of the entire system by six weeks. K&N offered no evidence to refute Koepke's testimony. The district court did not clearly err in relying on Koepke's expert testimony and finding that the damage to the control frame affected the value and operation of the entire base station. Accordingly, the court properly determined that the liability limitation here must be based on the weight of the

entire cellular base station, not only on that of the damaged control frame.

### C. K&N's Other Arguments

K&N offers two other reasons for avoiding or limiting its liability, neither of which is persuasive. First, we do not accept K&N's argument that, by contracting with FedEx to transport the cargo, K&N effectively carried out its duty to take all necessary measures to avoid damage as required by Article 20 of the Convention. Forwarders, such as K&N, assume the responsibility of a carrier, who actually executes the transport, even though the forwarder does not carry the merchandise itself. *DHL Corp. v. Civil Aeronautics Bd.*, 584 F.2d 914 (9th Cir. 1978). "Article 20 requires of defendant proof ... of an undertaking embracing all precautions that in sum are appropriate to the risk." *Mfr. Hanover Trust Co. v. Alitalia Airlines*, 429 F.Supp. 964, 967 (S.D.N.Y.1977). The record does not contain any evidence that K&N took all necessary measures to avoid damage to the cargo. In fact, K&N failed to even offer any such proof at trial.

Second, K&N argues that its air waybill, which serves as the bill of lading for goods transported by air, prescribed the amount of damages available to Motorola. K&N's air waybill included the following provision: "In cases of loss, damage or delay of part of the consignment, the weight to be taken into account in determining carrier's limit of liability shall be only the weight of the package or packages concerned." Although Article 33 of the Convention allows carriers to make "regulations which do not conflict with the provisions of this convention," Article 23 specifically states that "[a]ny provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid down in this convention shall be null and

void." To the extent that K&N's air way-bill provision may fix a lower liability limit here, where the damaged portion affected the entire shipment, the provision conflicts with and is null and void under Article 23.

## II. Prejudgment Interest

The district court awarded Motorola prejudgment interest in addition to the liability damages. The combined dollar amount of the award including such interest thus exceeded the liability limitation allowable under the Convention. The Convention does not discuss prejudgment interest and provides only for an amount calculated by multiplying the weight of the cargo by the dollar per-unit-of-weight multiple. We have not previously addressed the availability of a prejudgment interest award under the Convention. We conclude, however, that the award of prejudgment interest is consistent with the purposes of the Warsaw Convention and with postratification understandings of the treaty's contracting parties.

### A.

Other courts to have considered this question have arrived at differing conclusions. In *Domangue v. Eastern Air Lines, Inc.*, 722 F.2d 256 (5th Cir.1984), the Fifth Circuit held that prejudgment interest on damages could be awarded in a wrongful death claim brought under the Convention and the Montreal Agreement of 1966.[8] After reviewing both the Warsaw Convention and the drafting history of the Montreal Agreement, *id.* at 261–64, the court concluded that "allowing victims a

more adequate recovery and ensuring speedy disposition of claims were important objectives leading to modification of the Warsaw Convention by the Montreal Agreement," and thus that "awarding prejudgment interest is permissible under the Warsaw/Montreal body of law...." *Id.* at 263. Subsequently, the Fifth Circuit applied *Domangue* to a Warsaw Convention cargo liability claim, upholding an award of prejudgment interest "under the Convention itself." *Boehringer–Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.*, 737 F.2d 456, 460 (5th Cir. 1984), *appeal dismissed and cert. denied*, 469 U.S. 1186, 105 S.Ct. 951, 83 L.Ed.2d 959 (1985). New York state courts have agreed with this view. *See Maro Leather Co. v. Aerolineas Argentinas*, 161 Misc.2d 920, 617 N.Y.S.2d 617, 620 (1994) (awarding prejudgment interest in a case involving the loss of goods under the Convention), *cert. denied*, 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995); *Eli Lilly Argentina, S.A. v. Aerolineas Argentinas*, 133 Misc.2d 858, 508 N.Y.S.2d 865, 867 (1986).

On the other hand, two other circuits in this country and an English court have reached the opposite conclusion. In *O'Rourke v. Eastern Air Lines, Inc.*, 730 F.2d 842 (2d Cir.1984), decided shortly after *Domangue*, the Second Circuit disagreed with the Fifth Circuit's reasoning and declined to award prejudgment interest under the Convention and the Montreal Agreement on a wrongful death claim, stressing that the Convention's purpose was to fix definite and uniform limits on

---

**8.** The Montreal Agreement is a private pact among airlines that was approved by the United States government, *see* 31 Fed. Reg. 7302 (May 13, 1966); it raised the cap on damages for passengers from $8,300 to $75,000. *Carey v. United Airlines*, 255 F.3d 1044, 1047 n. 9 (9th Cir.2001). The Montreal Agreement, although not a treaty, requires

compliance from all signatories when their flight itinerary includes a stop in the United States. *Id.* Although the Agreement does not address cargo liability, we consider the Agreement and its drafting history relevant to assessing the Warsaw Convention parties' general understandings.

the cost to airlines of damages sustained by their customers. Moreover, the court was "not convinced that the payment of prejudgment interest would necessarily have any impact on the speed with which claims under the Convention are resolved," nor was it "satisfied that[speedy resolution of claims was] one of the main purposes of the [Warsaw and Montreal] agreements." *Id.* at 852. (*But see* discussion at note 10, *infra.*) Rather, it was "beyond dispute that the purpose of the liability limitation[s] prescribed by Article 22 was to fix at a definite level the *cost to airlines* of damages sustained by their passengers and of insurance to cover such damages." *Id.* (quoting *Reed v. Wiser*, 555 F.2d 1079, 1089 (2d Cir.1977)). The court also found it significant that the Montreal Agreement provided for a liability cap of $75,000 for passenger injuries that was inclusive of all attorney's fees and costs, but a lower $58,000 cap exclusive of such fees in jurisdictions allowing separate awards. "[I]t would appear that, if the signatories to the Agreement had intended to create any exclusions to the damage limitation figures, they would have included a specific provision in the agreement similar to the one concerning a separate award of legal fees and costs." *O'Rourke*, 730 F.2d at 853. Like the Fifth Circuit, the Second Circuit has extended its holding to the award of prejudgment interest in a cargo case. *See Exim Industries, Inc. v. Pan American World Airways, Inc.*, 754 F.2d 106, 109 (2d Cir.1985).

The Seventh Circuit has agreed with the Second Circuit's position. *Deere*, 855 F.2d at 391–92. There, too, the court emphasized that "the preeminent purpose of the Convention was to fix definite and uniform limits on the cost to airlines of damages sustained by their customers," adding that "[t]his goal is inherently incompatible with full compensation to all customers." *Id.* It thus held that "as part of a damage award,

prejudgment interest is subject to the conditions and limits imposed under … the Convention. The signatories fixed a cap on liability; they did not set forth any specific provisions exempting prejudgment interest from this global damage limitation figure." *Id.* at 392.

The English Court of Appeal has also held that prejudgment interest is not permitted under the Convention. In *Swiss Bank Corporation v. Brink's–MAT Ltd.*, [1986] 2 Lloyd's Rep. 79,101 (Eng. C.A.), that court looked to the 1955 Hague Protocol, which, as noted above, amended the Warsaw Convention. Observing that Article 22 of the Hague Protocol had made explicit that attorney's fees and costs *may* be awarded in excess of the liability caps, the court reasoned that the absence of similar language permitting prejudgment interest indicated that the award of such interest was not permissible. *Id.* Justice Bingham, however, candidly acknowledged that his interpretation "certainly is not, in my judgment, one that leaps out of the page or presents itself as so obviously correct as to enable one with supreme confidence to reject any alternative construction," and that there was no "international consensus on the construction of the Convention on this point." *Id.* at 101, 102.

### B.

Having framed the analysis by examining the reasoning of our American and British colleagues, our own analysis leads us to agree with the interpretations of the Fifth Circuit and the New York state courts. Because neither the text nor the drafting history of the Warsaw Convention itself addresses prejudgment interest, we must look to other indicators of the Convention's meaning, including its purpose and the postratification understanding of the contracting parties. *See Chan*, 490

U.S. at 134, 109 S.Ct. 1676; *Tseng*, 525 U.S. at 167–76, 119 S.Ct. 662. Here, we conclude that an award of prejudgment interest is consistent with the language and purposes of the Warsaw Convention, and with postratification developments.

## C. *Purpose*

### 1.

■ The Convention was intended to balance the interests of shippers seeking recovery for lost, delayed or damaged goods, and the interests of air carriers seeking to limit potential liability. *See Tseng*, 525 U.S. at 170, 119 S.Ct. 662. The award of prejudgment interest simply assures that the limited damages available to the successful claimant will not be eroded by the defendant's actions in delaying a prompt resolution of the claim. Such interest does not convert a damage award into "full compensation" to the plaintiff as the Seventh Circuit suggested, *Deere*, 855 F.2d at 392, because the carrier's damage liability remains fixed and limited by the Convention's weight-based formula. Rather, prejudgment interest is a mechanism by which the court, in an appropriate case, may assure that the plaintiff receives the full value of his limited damages. As the district court concluded here:

> Prejudgment interest should be available in this context, because without this interest plaintiff would not actually receive the limited compensation that is allowed under Article 22(2). If plaintiffs had recovered the value of their loss at the time of, or shortly after their cargo was damaged, then they presumably

would have been able to gain a return on their money. Because the limitation on liability still provides a cap on potential damages regardless of the true value of the cargo lost or destroyed, carriers continue to have a predictable gauge of liability.

*See also Eli Lilly*, 508 N.Y.S.2d at 867 ("Were prejudgment interest disallowed, the money paid would, in essence, be less than the limitation imposed by the Convention. It would be the present value of a future payment, a discounted amount."). As the court stated in *Eli Lilly*, "the purpose of the Convention—to fix at a definite level *the cost to airlines* of damages [—] is served rather than thwarted by awarding interest." *Id.* (internal quotations and citation omitted).[9]

Moreover, such a potential interest award does not defeat the Convention's important objective of having damages that are "fixed, uniform and knowable." *Deere*, 855 F.2d at 392. The amount of such potential interest—both the maximum and the most probable—can be reasonably calculated given that Article 22 fixes a maximum amount of damages and the interest rate is a known factor. For example, in the present case, involving a shipment of goods, K&N could have calculated its maximum exposure (with or without prejudgment interest) based on the weight of the entire shipment at the time it issued its air waybill.

### 2.

The award of prejudgment interest also is consistent with an additional purpose of

---

**9.** Prejudgment interest is widely recognized by federal courts as a means to restore to a plaintiff the actual value of damages where there has been a delay between the time of injury and the date of judgment. *See, e.g., Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); *Hopi Tribe v. Navajo Tribe*, 46 F.3d 908, 922 (9th Cir.1995) ("[M]oney has a time value, and prejudgment interest is therefore necessary in the ordinary case to compensate a plaintiff fully for a loss suffered at time t and not compensated until t + 1.") (internal quotation marks and citation omitted).

the Warsaw system, a purpose emphasized by the Montreal Agreement of 1966: to foster speedy resolution of lawsuits under the Convention.[10] As noted earlier, the Montreal Agreement, a private pact among airlines approved by the United States but not applicable to Motorola's cargo-damage claim here, does inform our interpretative analysis. *See* note 8, *supra.* During the negotiations over the Montreal Agreement, delegates expressed concern that liability awards be paid quickly and economically, maximizing the amount of compensation a passenger would realize from the limited damages available. The airlines would enjoy a capped amount of damages, providing them with a fixed and readily insurable potential exposure, in exchange agreeing to "absolute" liability such that passengers might avoid protracted investigations and litigation that would delay payment and eat into the amount of money they actually recovered.[11] As two authoritative sources, themselves American delegates at the 1966 Montreal Conference, have emphasized, speedy resolution of claims was a central concern of the delegates. *See* Andreas F. Lowenfeld & Allan I. Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv. L. Rev. 497, 587 (1967) ("With absolute liability, litigation would be reduced, settlements would be quicker, and the value of plaintiffs' recoveries would, it was argued, be substantially greater than under the Warsaw system."); *id.* at 600 ("But in the present context of

acceptance of a limit on liability at a level lower than the desired goal, absolute liability was viewed primarily in terms of the prospect of quicker and less expensive settlements, with less time and less money going for litigation than would have prevailed under the common law system . . . . Experience had shown that in major personal injury and death cases litigation and delay seriously impair the value of the compensation eventually awarded."); *see also id.* at 570–72, 590. By discouraging unwarranted delays, prejudgment interest furthers the purpose of speedy resolution of claims.

### D. *Postratification Developments*

#### 1.

Postratification developments also imply that the Convention permits prejudgment interest in excess of the liability caps. Specifically, there is evidence that the contracting parties have understood the Convention's limitations on damages not to be inviolate, but to be subject to, for example, cost-shifting exceptions. The 1955 Hague Protocol discussed in Part I, above, amended the Convention to provide explicitly for the award of costs and attorney's fees, in accordance with local law and custom, above and beyond the Convention's liability limits:

> The limits prescribed in this Article shall not prevent the court from awarding, in accordance with its own law, in

---

10. We disagree with the Second Circuit's conclusion that "the speedy resolution of claims was apparently not an important United States objective at the [1966 Montreal] conference"—a lynchpin of its own rejection of the Fifth Circuit's contrary conclusion in *Domangue. See O'Rourke,* 730 F.2d at 853 n. 20. The very authority *O'Rourke* cites repeatedly states otherwise. *See* Andreas F. Lowenfeld & Allan I. Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv. L. Rev. 497, 570–72, 587, 600 (1967).

11. "Under the Warsaw Convention as modified by the Montreal Agreement, liability can accordingly be viewed as 'absolute' only in the sense that an airline cannot defend a claim on the ground that it took all necessary measures to avoid the injury." *Air France v. Saks,* 470 U.S. 392, 407, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). A carrier can still defeat liability on grounds other than its exercise of due care.

*addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff.* The foregoing provisions shall not apply if the amount of the damages awarded, excluding court costs and other expenses of the litigation, does not exceed the sum which the carrier has offered in writing to the plaintiff within a period of six months from the date of the occurrence causing the damage or before the commencement of the action, if that is later.

Article 22(4) (emphasis added).[12] By all indications, this was a *clarifying* amendment, not one that worked a substantive change. Indeed, as has been observed, at the time of the Hague conference in 1955, "[n]o one outside the United States had previously thought that the Warsaw Convention prevented a charge on the defendant for the plaintiff's costs," including attorney's fees. Lowenfeld & Mendelsohn, *supra,* 80 Harv. L. Rev. at 508. *See Domangue,* 722 F.2d at 261.

 The actions at The Hague and the account of Lowenfeld and Mendelsohn thus indicate that the Warsaw signatories did not envision the Convention's liability caps as ceilings on the amount of money a carrier would have to pay. The reasoning of both the Seventh Circuit and the Second Circuit that "air carriers should be protected from having to pay out more than a fixed sum for passenger injuries sustained in international air disasters," *O'Rourke,* 730 F.2d at 852 (quoting *Reed v. Wiser,* 555 F.2d 1079, 1089 (2d Cir.1977)); *see Deere,* 855 F.2d at 391, and that only explicit exceptions are permitted, *id.* at 392, appears to be based on a mistaken premise. Although the liability caps obviously restrict damages, they are not an absolute ceiling on a carrier's total payout. And the history of the Hague Protocol indicates that the Warsaw signatories did not understand the absence of the Convention's explicit authorization for costs and attorney's fees to have precluded a court from shifting those costs to the carrier. Thus, finding an implicit authority to award prejudgment interest to assure that the plaintiff receives the full value of the capped damages—shifting to the defendant the burden of the time value of money—likewise could not offend the Convention.[13]

---

12. Article 22(4) was amended by the as-yet-unratified 1999 Montreal Convention to permit explicitly the award of "interest" as well as costs and fees:

> The limits prescribed in Article 21 and in this Article shall not prevent the court from awarding, in accordance with its own law, in addition, the whole or part of the court costs and of the other expenses of the litigation incurred by the plaintiff, *including interest . . . .*

Convention for the Unification of Certain Rules for International Carriage by Air done at Montreal on 28 May 1999, S. Treaty Doc. No. 106–45, Art. 22(6)(emphasis added). This uncontroversial amendment by its terms does not appear to deal with the issue of prejudgment interest. *See also* 2 International Civil Aviation Organization, *International Conference on Air aw, Montreal 10–28 May 1999,* at 31, 41 (2001) (Documents); 3 *id.* at 49, 176 (Preparatory Materials).

13. We recognize that costs and attorney's fees are not "damages," whereas prejudgment interest is so characterized. *See Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 335, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988) (characterizing prejudgment interest as a component of damages). But we think this parses things too finely. Conceptually, prejudgment interest more closely resembles other costs of litigation—attorney's fees and costs—than damages. Moreover, the overriding purpose of the 1929 Convention was to aid the growth of the "then-fledgling international airline industry." *Tseng,* 525 U.S. at 170, 119 S.Ct. 662. It could not have mattered whether the cap was exceeded because of additional "damages" in form of prejudgment interest or because of "costs" and "fees."

As discussed in Section II.A, above, those courts that have ruled against prejudgment interest have been persuaded that the post-Warsaw Convention treatment of attorney's fees and costs through explicit provisions weighs against finding implicit authority for an additional award of interest. There is some force to that reasoning. Nonetheless, given the history we have reviewed above, we are reluctant to consider the treatment of fees and costs dispositive on the issue of prejudgment interest. That the contracting parties have elected to deal with one set of particular costs to carriers does not signal a conscious understanding that prejudgment interest is barred absent an amendment to the Warsaw Convention. Indeed, given that the longstanding, conflicting court rulings on prejudgment interest have not motivated the contracting parties to adopt one position or the other, we cannot accept that the failure to address prejudgment interest in the postratification era means it was foreclosed by the 1929 Warsaw Convention.

### E.

 Having thus reviewed the various sources that might assist our interpretation of the Convention, we are persuaded that the district court adopted the better view. Nothing in the text or history of the Warsaw Convention generally or Article 22 in particular shows the Convention's drafters intended to exclude an award of prejudgment interest. Such interest is consistent with the purposes of the Convention and comports with the available evidence of the postratification understanding of the contracting parties. We therefore hold that, in an appropriate case,

a court may exercise its discretion to award prejudgment interest.[14]

## CONCLUSION

We affirm the district court's award of $244,080 and prejudgment interest to Motorola.

**AFFIRMED.**

---

14. K&N asserts only that the district court had no authority to award interest. K&N does not argue that the district court abused its discretion by doing so. *See Simeonoff v.*

*Hiner,* 249 F.3d 883, 894 (9th Cir.2001) ("We review a grant or denial of prejudgment interest for abuse of discretion."). Accordingly, we do not consider that question.