**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CONTINENTAL INSURANCE COMPANY,
a corporation,

        *Plaintiff-Appellee,*

v.

FEDERAL EXPRESS CORPORATION, a
corporation,

        *Defendant-Appellant.*

No. 03-57162

D.C. No.
CV-00-00696-NMM

CONTINENTAL INSURANCE COMPANY,
a corporation,

        *Plaintiff-Appellant,*

v.

FEDERAL EXPRESS CORPORATION, a
corporation,

        *Defendant-Appellee.*

No. 03-57214

D.C. No.
CV-00-00696-NMM

OPINION

Appeal from the United States District Court
for the Central District of California
Nora M. Manella, District Judge, Presiding

Argued and Submitted
October 17, 2005—Pasadena, California

Filed June 29, 2006

Before: Procter Hug, Jr., Harry Pregerson, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Hug

7153

## COUNSEL

Robert J. Taitz and David R. Shane, Shane & Taitz, Greenbrae, California, for the defendant-appellant/appellee.

Timothy R. Lord and Bernadette M. Chala, Lewis Brisbois Bisgaard & Smith, LLP, Costa Mesa, California, for the plaintiff-appellee/appellant.

## OPINION

HUG, Circuit Judge:

This appeal is from a stipulated judgment for $109,023.24 in favor of Continental Insurance Company ("Continental") for goods lost in shipment by Federal Express Corporation ("FedEx"). We have jurisdiction because the parties reserved the right to appeal the district court's rulings on the applicability of the Original Warsaw Convention and its subsequent amending agreements, the Hague Protocol and the Montreal Protocol No. 4.

## I.  BACKGROUND

On March 31 and April 15, 1999, FedEx and Comet Electronics Co., Ltd., entered into a contract of carriage, whereby FedEx agreed to ship by air packages containing integrated circuits and memory modules from Hong Kong to Pasadena,

California, with delivery to Viken Electronics. Four packages never arrived. The insurer of these cargoes, Continental, was subrogated to the rights of Viken Electronics, the consignee and owner of the goods. Continental filed an action against FedEx in the California Superior Court, alleging causes of action for loss of cargoes under the Warsaw Convention, negligence, breach of contract, breach of the duty to care for property and bailment, and conversion. Continental alleged the losses of shipments "including, but not necessarily limited to, air waybill number[s] 8101 8095 3045 . . . [and] 8101 8095 3137" ("3045" and "3137"). FedEx removed the case to the United States District Court for the Central District of California. It is undisputed that the Warsaw Convention preempts the state law causes of action.

## A.   *First Motion for Partial Summary Judgment.*

FedEx sought partial summary judgment that its liability was limited as to waybills 3045 and 3137 under the amended version of the Warsaw Convention presently in force between Hong Kong and the United States, which it alleged either to be The Hague Protocol of 1955 ("The Hague Protocol")[1] or the Montreal Protocol No. 4 (1975).[2] Compared to the Original Warsaw Convention, both versions substantially relax preconditions to limited liability.

The Original Warsaw Convention presumes liability of the carrier for goods lost or destroyed while entrusted to the carrier, but limits permissible recovery unless a special declara-

---

[1] Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on 12 October 1929, opened for signature Sept. 28, 1955, art. XI, 478 U.N.T.S. 371, 381.

[2] Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, signed at Warsaw on 12 October 1929, amended by Protocol Done at the Hague on 28 September 1955, Sept. 25, 1975, ICAO Doc. 9148, *reprinted* in Lawrence B. Goldhirsch, The Warsaw Convention Annotated: A Legal Handbook 401 (2000).

tion of value is made when the goods are delivered to the carrier, and the shipper has paid a supplementary sum according to the value. *See* Original Warsaw Convention art. 22(2). However, Article 9 provides that "the carrier shall not be entitled to avail himself of the provision of this convention which excludes or limits his liability . . . if the air waybill does not contain all of the particulars set out in Article 8 (a) to (i), inclusive and (q)."[3] Article 8(i) requires the air bill to contain the weight of the goods. By contrast, The Hague Protocol only requires notice of stop-over destinations on the waybill. The Montreal Protocol No. 4 abandons the cargo documentation provisions of the Original Warsaw Convention entirely, permitting limitation of liability even in the absence of an air waybill.

Before the district court ruled on FedEx's first motion, Continental broadened the scope of its suit to include two

---

[3]Specifically, the air waybill must contain the following particulars:

(a) the place and date of its execution;

(b) the place of departure and of destination;

(c) the agreed stopping places, provided that the carrier may reserve the right to alter the stopping places in case of necessity . . . ;

(d) the name and address of the consignor;

(e) the name and address of the first carrier;

(f) the name and address of the consignee . . . ;

(g) the nature of the goods;

(h) the number of packages, the method of packing, and the particular marks or numbers upon them;

(i) *the weight, the quantity, the volume, or dimensions of the goods*;

. . .

(q) a statement that the transportation is subject to the rules relating to liability established by this convention.

Warsaw Convention art. 8(a)-8(q) (emphasis added).

additional waybills — 8101 8095 3067 and 8101 8095 3056 ("3067" and "3056"). FedEx maintained that Continental was barred from pursuing claims for additional waybills. However, the district court also permitted Continental to proceed on waybills 3067 and 3056.

Because weight notations appeared on the waybills in evidence for 3045 and 3137, FedEx stated "for the purposes of this motion only, Federal Express will concede that this matter is governed solely by the Original Warsaw Convention." Obviously, this concession was made because the waybills complied with all the requirements of the Original Warsaw Convention, including the weight requirement. Thus, partial summary judgment was granted for FedEx on those two waybills.

The district court permitted Continental to proceed on waybills 3067 and 3056 because Continental's complaint stated that the action involved the loss of shipments "including but not necessarily limited to, air waybill numbers 3045 and 3137." The copies of waybills number 3067 and 3056 did not contain the weight of the goods shipped on the copies of the waybills before the court; therefore, the district court denied partial summary judgment limiting liability as to those shipments.

## B.  *Second Motion For Partial Summary Judgment.*

FedEx's second motion for partial summary judgment referenced waybills 3067 and 3056 specifically. Because the *billing copies* of waybills 3067 and 3056, on which the cargo weights were clearly marked, were then in evidence, FedEx conceded again only for purposes of summary judgment that the Original Warsaw Convention applied. However, this time the district court ruled that waybills 3067 and 3056 were technically deficient under Article 8 of the Original Warsaw Convention because the *sender's copies*, which omit the cargoes' weight, had also been entered into evidence.

## C.  *Law Of The Case Doctrine.*

In telephonic conferences on July 7 and July 30, 2003, the district court relied on FedEx's limited concessions and held that the Original Warsaw Convention was the law of the case, thereby barring further consideration at trial of what treaty governs, and, in the district court's view, resolving all outstanding legal issues. Only the factual question of damages remained. To posture the case for appeal, the parties stipulated to damages and entered a consent judgment, which explicitly reserved their rights of appeal. We have jurisdiction over this appeal of the stipulated judgment due to this reservation of the right to appeal. *See U.A. Local 342 Apprenticeship & Training Trust v. Babcock & Wilcox Construction Co.*, 396 F.3d 1056, 1058 (9th Cir. 2005).

FedEx appeals the district court's use of the law of the case doctrine and challenges the district court's holding that the Original Warsaw Convention controls the case and precludes consideration of The Hague Protocol or the Montreal Protocol No. 4.

## II.   DISCUSSION OF FEDEX'S APPEAL

We review *de novo* a district court's interpretation of treaties to which the United States is a party. *Motorola, Inc. v. Federal Express Corp.*, 308 F.3d 995, 999 n.6 (9th Cir. 2002). We review applications of law of the case doctrine for abuse of discretion. *Milgard Tempering, Inc. v. Selas Corp. of America*, 902 F.2d 703, 715 (9th Cir. 1990). Here, the district court abused its discretion in applying the law of the case doctrine for two reasons.

First, the court misunderstood the effect of its summary judgment rulings. FedEx sought summary judgment on whether liability is limited *even if* the Original Warsaw Convention applies. It did not concede that this applied for the purposes of trial if the motion was denied. Denying summary

judgment rendered no decision on what law governed; no actual ruling on the issue of applicable law was made. The record bears this out: nowhere is it evident that the court actually analyzed the treaties in force. By invoking the law of the case doctrine to prevent judicial consideration of a dispositive legal issue not yet ruled upon for the purposes of trial, the district court abused its discretion.

Second, the district court erred by applying the Original Warsaw Convention to this case. Given that various nations have ratified either the Original Warsaw Convention or its various amending agreements, the question as to what law applies has ordinarily been determined on a "lowest common denominator" basis. *See, e.g., G.D. Searle & Co. v. Federal Express Corp.*, 248 F. Supp. 2d 905, 907-09 (N.D. Cal. 2003); *see also* Paul S. Dempsey, *International Air Cargo & Baggage Liability And The Tower Of Babel*, 36 GEO. WASH. INT'L L. REV. 239, 240 (2004). The latest treaty ratified by both origin and destination countries supplies the governing law. The most recent common treaty in force between Hong Kong and the United States is not the Original Warsaw Convention, but The Hague Protocol.

## A.  *Hong Kong.*

[1] From July 1, 1997, the People's Republic of China resumed the exercise of sovereignty over Hong Kong from the United Kingdom, becoming a Special Administrative Region ("SAR") of China. Prior to that date, the U.K. had ratified treaties and other international agreements on Hong Kong's behalf. Upon changing status to a SAR, Hong Kong neither automatically ceased to honor its past obligations nor automatically became subject to China's agreements. Rather, China issued a joint statement with the U.K. to the effect that certain enumerated treaties to which China was a party would be applied to Hong Kong from July 1, 1997, while certain treaties to which China was not yet a party, but which applied to Hong Kong prior to July 1, 1997, would continue to apply.

*See The Position Of The People's Republic Of China And The United Kingdom On Multilateral Treaties Applying To The Hong Kong Special Administration Region*, 36 I.LM. 1671, 1676-1678 (1997). This document gave renewed effect in Hong Kong to both The Hague Protocol and the Original Warsaw Convention. *See id.* at 1678, 1684; *see also* DEPT. OF STATE, TREATIES IN FORCE: A LIST OF TREATIES AND OTHER INTERNATIONAL AGREEMENTS OF THE UNITED STATES IN FORCE ON JANUARY 1, 2004, 349 n.3 (2004).

**[2]** By contrast, the Montreal Protocol No. 4 did not become effective in the U.K. until June 14, 1998, long after Hong Kong's change of status. *See* RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS OF THE UNITED STATES § 322(1) (1986) (observing that "the provisions of an international agreement do not bind a party in relation to any act or fact that took place . . . before the date of the entry into force of the agreement with respect to that party"). Because the Montreal Protocol No. 4 never came into force in Hong Kong, was never subject to the Chinese/British note on multilateral treaties applying to Hong Kong, and, indeed, was ratified by China itself only within the last year—without application to Hong Kong—the Montreal Protocol No. 4 cannot apply.

## B.   *The United States.*

**[3]** The United States expressly ratified The Hague Protocol on December 14, 2003. However, the question before the court is whether, by adopting the Montreal Protocol No. 4, the United States acceded to The Hague Protocol, such that the terms of the Original Warsaw Convention as amended by The Hague Protocol should govern this matter. This is a question of first impression in this circuit.

**[4]** In dictum, the Ninth Circuit has noted that "The Hague Protocol did not enter into force for the United States until the Montreal Protocol No. 4 was ratified by the Senate" on March 4, 1999, *Motorola Inc.,* 308 F.3d at 999 n.6, implying that

upon ratification of the Montreal Protocol No. 4, the United States became bound by the terms of The Hague Protocol. District courts in the Southern, Central, and Northern Districts of California have adhered to *Motorola* and the March 4, 1999 date. *See, e.g., Polanski v. KLM Royal Dutch Airlines*, 378 F. Supp. 2d 1222, 1226 (S.D. Cal. 2005) ("[O]n September 28, 1998, the United States ratified a later amending treaty, Montreal Protocol No. 4, which became effective as to the United States on March 4, 1999. By doing so, the United States acceded to the Warsaw Convention as amended by the Hague Protocol.") (citations omitted); *In re Air Crash at Taipei, Taiwan*, 2002 WL 32513726, *4 (C.D. Cal. Dec. 19, 2002) (Not Reported in F. Supp. 2d) ("[R]atification [of Montreal Protocol No. 4] made the Hague Protocol effective in the U.S. as of March 4, 1999."); *G.D. Searle*, 248 F. Supp. 2d at 907-909 (concluding that by ratifying the Montreal Protocol No. 4 the U.S. "did in fact express its consent to accede to the Warsaw Convention as amended by the Hague Protocol").

**[5]** The Second Circuit agreed in *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 431 (2d Cir. 2001). The Second Circuit stated that the United States was not governed by The Hague Protocol "until another international agreement, Montreal Protocol No. 4, was ratified by the Senate on September 28, 1998 and became effective on March 4, 1999." Even *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 307 n.4 (2d Cir. 2000), relied on heavily by Continental, accepts that the United States "acceded to the Warsaw Convention as amended by the Hague Protocol" upon ratification of the Montreal Protocol No. 4. *See also Schopenhauer v. Compagnie Nat'l Air Fr.*, 255 F. Supp. 2d 81, 86 (E.D.N.Y. 2003) ("When referring specifically to the 1955 Hague revisions of the original Warsaw Convention, the Court occasionally refers to the 'Hague Protocol,' even though those revisions did not take effect in this country until the ratification of Montreal Protocol No. 4 in 1999."); *Royal & Son Alliance Ins. v. Am. Airlines, et al.*, 277 F. Supp 2d 265, 268 (S.D.N.Y. 2003) ("The Second Circuit has twice recognized that the

United States has acceded to the Hague Protocol, as has the Ninth Circuit.").[4]

**[6]** This treatment is consistent with the language of the Montreal Protocol No. 4, the Vienna Convention on the Law of Treaties, and positions taken by the Executive Branch. A review of the express language of the Montreal Protocol No. 4 indicates that by ratifying the Montreal Protocol No. 4, the United States expressed its consent to accede to The Hague Protocol. Article XVII(2) of the Montreal Protocol No. 4 provides:

> This provision ***incorporates by reference*** the revisions to the Warsaw Convention made at The Hague in 1955 and defines the resulting single instrument as the Warsaw Convention as amended at The Hague, 1955, and by Protocol No. 4 of Montreal, 1975. (emphasis added)

Likewise, Article XVII provides that

> Ratification by any state which is not a party to the Warsaw Convention and to The Hague Protocol ***has the effect of accession*** to the new single instrument defined in Article XV. Paragraph 2 of this article has the important function of making clear that it is ***not necessary to ratify*** the Warsaw Convention or The Hague Protocol in order ***to become a party*** to the new single instrument created by Protocol 4. (emphasis added)

Read in conjunction, this language supports our position, as does Article 40 of the Vienna Convention on the Law of Trea-

---

[4]In a recent case, however, the Second Circuit retreated from this position, treated *Fujitsu*'s statements adopting the March 4, 1999 date as dicta, and arrived at a different construction. *See Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 82-90 (2nd Cir. 2005).

ties, reprinted in 63 AM. J. INTL. L. 875 (1969). Article 40 addresses the amendment of multilateral treaties and provides that:

> 5. Any state which becomes a party to the treaty after the entry into force of the amending agreement shall, failing an expression of a different intention by that state:
>
> (a) be considered as a party to the treaty as amended; and
>
> (b) be considered as a party to the unamended treaty in relation to any party to the treaty not bound by the amending agreement.[5]

*See also Saul Sorkin, Goods In Transit* § 9.19 (2003) ("[I]f a State failed to become a party to the original Warsaw Convention but thereafter adhered to the Hague Protocol to the Warsaw Convention it thereby became a party to the Warsaw Convention."); Dana L. Christensen, Comment*, The Elusive Exercise of Jurisdiction Over Air Transportation Between The United States and South Korea*, 10 PAC. RIM L. & POL'Y J. 653, 688-89 (2001) ("[M]ost scholars agree that . . . adherence to an amending agreement binds a new party to the terms of the original treaty with respect to parties that adhere solely to that treaty.")

[7] The authorities cited above are persuasive. We hold that the ratification of the Montreal Protocol No. 4 brought The Hague Protocol into full force and effect in the United States on March 4, 1999.

---

[5]The Second Circuit in *Avero Belgium* did not apply section 5(b) because the court held that the United States, in ratifying Protocol No. 4 of Montreal, expressed an intention that this provision did not apply. We reach a contrary conclusion, holding that no such intention was expressed by Congress.

We observe that President Bush's transmittal to the Senate on July 31, 2002 of The Hague Protocol for advice and consent, S. Treaty Doc. No. 107-14, 1955 WL 45606 (2002), does not undermine this holding. The transmittal took no position on The Hague Protocol's then-current status. It was offered to dispel future uncertainty as to whether the United States is bound by The Hague Protocol. In a June 2003 State Department white paper, offered as testimony before the Senate Foreign Relations Committee, the Administration clarified that it sought to eliminate any ambiguity for the future, observing only that:

> If the courts were to conclude that Montreal Protocol No. 4 does not create treaty relations under The Hague Protocol, the United States' treaty relations with the 79 countries that are parties to both the Warsaw Convention and The Hague Protocol, but not to Montreal Protocol No. 4, would be based on the Warsaw Convention, unamended by any later protocol . . . . This is an unsatisfactory result . . . . Ratification of The Hague Protocol will eliminate any ambiguity and secure for the U.S. industry The Hague Protocol's more modern cargo documentation rules, which are critical to the efficient movement of air cargo.

*John R. Byerly, U.S. Aviation Policy: the Montreal Convention and The Hague Protocol*, at http://www.state.gov/e/eb/rls/rm/2003/21869.htm.

### III.   CONTINENTAL'S CROSS-APPEAL

Because Continental later discovered the *sender's copies* of waybills 3045 and 3137, which omitted the cargoes' weight, Continental requested that the district court revisit its grant of summary judgment as to waybills 3045 and 3137 and "apply the same rule . . . that it later applied to waybills Nos. 3056 and 3067." The district court declined, noting this evidence

was available earlier, and the failure to present it was an oversight. On cross-appeal, Continental challenges the district court's refusal to harmonize its two rulings.

This type of oversight does not ordinarily meet the criteria for granting a motion for reconsideration. *See* C.D. Cal. L.R. 7.16. Furthermore, because we have held that The Hague Protocol governs all four waybills, the issue becomes moot. We deny Continental's cross-appeal.

## IV.   CONCLUSION

**[8]** The Montreal Protocol No. 4 brought The Hague Protocol into force in the United States on March 4, 1999. The Hague Protocol was in force in both Hong Kong and the United States at the time Continental's claims arose, which was March 31 and April 15, 1999, for the first and second shipments, respectively, and the district court erred by applying the Original Warsaw Convention. Because a district court abuses its discretion when it applies incorrect law, *see Casey v. Albertson's Inc.*, 362 F.3d 1254, 1257 (9th Cir. 2004), we **VACATE** the stipulated judgment, and **REMAND** for further proceedings consistent with the liability provisions of The Hague Protocol.

**VACATED and REMANDED.**